UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SCOTT OLIVER,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF GREGORY, CITY OF GREGORY, CITY OF WINNER, DEPUTY TIM DREY, individually and in his official capacity; OFFICER SHAWN CLAUSSEN, individually and in his official capacity; LAKIN STENSON, individually and in her official capacity; and JOHN AND JANE DOES 1-4, individually and in their official capacities,<br><br>Defendants. | 3:14-CV-03013-RAL<br><br><br><br>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

Plaintiff, Scott Oliver ("Oliver"), instituted this action under 42 U.S.C. § 1983 alleging that the Defendants—the County of Gregory, the City of Gregory, the City of Winner, Gregory County Deputy Tim Drey ("Deputy Drey"), City of Gregory Officer Shawn Claussen ("Officer Claussen"), Winner City Jail correctional officer, Lakin Stenson ("Stenson"), and John and Jane Does 1–4—were deliberately indifferent to his serious medical needs after his arrest and during his detention at the Winner City Jail ("WCJ"). Doc. 1. Oliver also alleged state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and negligent training, supervision, and hiring, as well as a punitive damages claim. Doc. 1. The County of Gregory, the City of Gregory, Deputy Drey, and Officer Claussen (collectively

1

"the Gregory Defendants") have filed a motion for summary judgment based upon the merits and on qualified immunity. Doc. 36. The City of Winner and Stenson (collectively "the Winner Defendants") and John and Jane Does 1–4 filed a similar motion for summary judgment. Doc. 50.

Oliver stipulated to dismissal of John and Jane Does 1–4 and at the hearing on the motions did not resist summary judgment for Defendants on his state law claims. Doc. 67. Oliver opposed both motions on the remaining § 1983 claims. See, e.g., Docs. 44, 62, 63. For the reasons explained below, the motions for summary judgment are granted in part and denied in part.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 places the burden initially on the moving party to clearly establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, Mo., 415 F.3d 908, 910 (8th Cir. 2005) (stating that nonmovant may not merely rely on allegations or denials). On summary judgment, courts view the evidence and

2

reasonable inferences in the light most favorable to the nonmoving party. Robbins v. Becker, 794 F.3d 988, 992 (8th Cir. 2015).

## III. FACTS

At approximately 10:00 p.m. on Friday, September 7, 2012, Oliver arrived at Frank Day's Bar in Dallas, South Dakota and remained there until the bar closed at approximately 2:00 a.m. on Saturday, September 8, 2012. Doc. 38 at ¶¶ 2–3; Doc. 40 at 2. Oliver drank beers while at the bar and was unable to find a ride home when the bar closed. Doc. 38 at ¶¶ 4–5; Doc 39-1 at 3; Doc. 40 at 2. Oliver did not have a coat with him and testified that the weather that night was cold—fifteen or twenty degrees[1]—and windy. Doc. 39-1 at 3–4. Oliver had a personal cell phone with him, but testified that he was unable to contact anyone for a ride home and could not complete calls because he was shaking so badly from the cold. Doc. 39-1 at 3–4.

At approximately 3:00 a.m., Oliver saw a light on in a mobile home located behind Frank Day's Bar where he knew dancers and employees of the bar resided at times. Doc. 38 at ¶¶ 7–8; Doc. 39-1 at 4; Doc. 40 at 2. Oliver decided to knock on the door of the mobile home to ask the individuals inside for help in obtaining a ride. Doc. 39-1 at 4. Oliver knocked for approximately ten minutes without making contact with anyone inside. Doc. 38 at ¶ 9; Doc. 40 at 2. Oliver testified that he again attempted to use his cell phone to call for help but because he was "shaking violently" from the cold he was unable to push buttons on his phone. Doc. 39-1 at 4. Unbeknownst to Oliver, the mobile home occupant and bar employee, Kara Doles ("Doles"), had called law enforcement because Oliver's pounding on the door had caused her to fear for her own safety. Doc. 38 at ¶ 11; Doc. 40 at 2–3.

---

[1] Oliver's recollection of the night of September 8, 2012, being so extraordinarily cold is at odds with weather records and the climate of south central South Dakota in early September.

3

Oliver then turned to walk down the steps to leave the mobile home's landing and fell. Doc. 38 at ¶ 10; Doc. 40 at 2. Oliver testified he rolled and twisted his right ankle because either he had missed a step or the step had given way. Doc. 39-1 at 5. Oliver was unsure whether he had broken his ankle at that time, but believed his ankle to be severely injured. Doc. 39-1 at 5. While on the ground, Oliver tried to use his cell phone again, but with no success. Doc. 39-1 at 5. Oliver stayed on the ground outside the mobile home and attempted to stay warm. Doc. 39-1 at 5.

Responding to Doles's call, Deputy Drey and Officer Claussen arrived at the scene in the same patrol car and parked approximately ten to fifteen feet from Oliver. Doc. 38 at ¶ 12; Doc. 40 at 3. Deputy Drey approached Oliver and asked him why he was on the ground to which Oliver coarsely replied that he was taking a nap. Doc. 39-1 at 5. The individual accounts of the events following that initial contact differ from one another.

According to Oliver, he told the officers that he thought he broke his ankle and needed to see a doctor. Doc. 39-1 at 5. Oliver testified that Deputy Drey and Officer Claussen then got on each side of him, put their arms under his shoulders, lifted him up off the ground, and that he helped as much as he could by pushing with his left leg.[2] Doc. 39-1 at 5. Once off the ground, according to Oliver, the officers carried him to the patrol vehicle, their arms still under his shoulders, and he assisted them by placing weight on his left leg and putting his right toe on the ground for balance. Doc. 42-3 at 2–3. Oliver testified that he could not put any weight on his right leg. Doc. 42-3 at 3. Once at the patrol vehicle, Oliver sat in the back seat and positioned himself upright, facing outward from the car. Doc. 39-1 at 9; Doc. 42-3 at 3. His ankle was not bleeding, not pointing in the wrong direction, and not displaced, but according to Oliver, it was

---

[2]Oliver testified that he weighed approximately 410 pounds in September of 2012. Doc. 39-1 at 5.

4

discolored and visibly swollen. Doc. 39-1 at 9–10. While sitting in the back of the patrol vehicle, according to Oliver, both Deputy Drey and Officer Claussen looked at his swollen ankle, and the officers said they thought his ankle was sprained. Doc. 39-1 at 9.

Officer Claussen testified that Oliver initially told the officers that he fell off the front porch of the mobile home, hurt his ankle, and needed help getting off the ground. Doc. 39-3 at 2. For that reason, Officer Claussen grabbed one of Oliver's hands and Deputy Drey grabbed the other, and both officers lifted Oliver off the ground. Doc. 39-3 at 2. Officer Claussen testified that both officers continued to hold onto Oliver's arms and elbows (and not under his shoulders) to escort Oliver as a suspect, rather than to assist him, to the patrol car. Doc. 39-3 at 4–5. Officer Claussen testified that Oliver was able to walk to the patrol car without assistance. Doc. 39-3 at 5. Officer Claussen did not testify that he examined Oliver's ankle; rather, he testified that when Oliver was in the back seat of the patrol car, Deputy Drey stood outside the vehicle and spoke with Oliver while Officer Claussen stood behind Deputy Drey. Doc. 39-3 at 2. According to Officer Claussen, Deputy Drey merely told Oliver to "sit tight" and that the officers would be back. Doc. 39-3 at 2.

According to Deputy Drey's account, Oliver told the officers that he fell off the steps, hurt his ankle, and rolled on the ground to the spot where he was found near a tree. Doc. 42-6 at 3. Although both officers assisted Oliver off the ground, Deputy Drey testified that Oliver never stated that he could not get off the ground himself. Doc. 42-6 at 3. Consistent with Officer Claussen's testimony, Deputy Drey testified that once Oliver was standing each officer steadied Oliver to the patrol vehicle, holding onto Oliver's wrists and elbows. Doc. 42-6 at 3. According to Deputy Drey, Oliver "walked just fine" to the patrol car and "seemed to be putting his full weight, which is a lot of weight, on both legs." Doc. 42-6 at 5, 12. When asked whether he

5

looked for any swelling, Deputy Drey testified that the only observations he made of Oliver's ankle occurred when Oliver walked on his ankle to the patrol car. Doc. 42-6 at 10.

Oliver stayed in the patrol car while both officers went to the mobile home to speak with Doles. Doc. 39-3 at 2–3; Doc. 42-6 at 4. After obtaining her statement, Deputy Drey informed Oliver that he was under arrest for disorderly conduct. Doc. 42-6 at 4. Oliver was then transported the twenty-two miles from Dallas to Winner, South Dakota.[3] Doc. 39-3 at 5. According to Deputy Drey, Oliver never complained about his ankle and never asked to go to the hospital during the drive from Dallas to Winner. Doc. 42-6 at 10.

Upon arriving at the WCJ, Deputy Drey and Officer Claussen attempted to remove Oliver from the patrol vehicle, but Oliver said he could not stand on his leg. Doc. 42-6 at 6. Oliver was able to get out of the patrol vehicle but would not walk on his foot, so the WCJ staff, including correctional officer Stenson, provided Oliver a chair with wheels.[4] Doc. 42-7 at 2. Oliver was wheeled into the booking area of the WCJ at approximately 4:21 a.m. Doc. 42-7 at 2; Doc. 60 at ¶ 42; Doc. 63.

Oliver testified that while he, Deputy Drey, Officer Clausen, and Stenson were in the booking area, Oliver said that his ankle hurt and that he needed to see a doctor. Doc. 58-11 at 13. According to Oliver, Stenson then asked Deputy Drey if Oliver was really hurt. Doc. 58-11 at 13. Oliver testified that Deputy Drey shook his head, and said to Stenson, "[N]o, he is not hurt, put him in the jail cell." Doc. 58-11 at 13. Oliver claims that Officer Claussen was standing next to Deputy Drey during this exchange. Doc. 58-11 at 13. According to Stenson, however, Oliver did not tell her that his ankle hurt and did not tell her that he wanted to go to the

---

[3]At that time, Gregory County had a contract with the WCJ which provided that the WCJ would provide jail services to Gregory County. Doc. 60 at ¶ 5; Doc. 63 at 2.
[4]The wheeled chair was the WCJ's "restraint chair," but Oliver was not restrained in any way; it was used because the WCJ did not have a wheelchair available. Doc. 42-7 at 3.

hospital or seek treatment.[5]   Doc. 42-7 at 11.   Deputy Drey and Officer Claussen then relinquished custody of Oliver to the WCJ and had no further contact with him. Doc. 38 at ¶ 23; Doc. 40 at 4.

The WCJ staff determined that Oliver was too intoxicated to be fully booked or to have his mug shot taken, so Stenson proceeded with the intake process because the WCJ had a policy not to release a person until he or she is sober, even if a bond is set. Doc. 41 at ¶ 120; Doc. 42-7 at 4–5; Doc. 68 at 2. Stenson administered a breathalyzer test to Oliver, which revealed a blood alcohol content level of .159. Doc. 42-7 at 5. Stenson entered Oliver's name into the computer system and assigned Oliver to a holding cell. Doc. 42-7 at 2, 6. The intake process took approximately fifteen minutes, and no medical questionnaire was completed for Oliver at that time. Doc. 42-7 at 5, 8. Oliver, who was still in the wheeled chair, was then transported to a holding cell. Doc. 42-7 at 11. Stenson testified that she observed Oliver stand up to get out of the chair and assumed that he walked into the holding cell. Doc. 42-7 at 11–12. Stenson also testified that she made no observations of Oliver's ankle and that she did not make any further observations of Oliver during the remainder of her working shift, which ended at 6:00 a.m. Doc. 41 at ¶¶ 112–13; Doc. 48 at 9; Doc. 68 at 2. Stenson did not return to work during the time Oliver was at the WCJ on September 8 or 9, 2012. Doc. 42-7 at 6; Doc. 60 at ¶ 66; Doc. 63.

Once sober and after posting bond, Oliver was released from the WCJ at 9:15 a.m. on Sunday, September 9, 2012. Doc. 41 at ¶¶ 120, 126–27; Doc. 48 at 10–11; Doc. 68 at 2. Kathy Mach ("Mach"), the correctional officer who released Oliver, testified that she and other WCJ staff assisted Oliver out of the jail in the wheeled chair and helped him get into a vehicle. Doc. 42-8 at 1, 5. Oliver's friend, Ronald Bruns, drove Oliver to the emergency room in Gregory,

---

[5]Neither of the officers testified whether Deputy Drey and Stenson had a conversation in the WCJ booking area. See Doc. 39-3; Doc. 42-6.

7

South Dakota, where he was examined by Physicians Assistant Katie Urban ("PA Urban") at approximately 9:55 a.m. Doc. 42-5 at 1, 4; Doc. 42-10 at 2.

PA Urban testified that Oliver's ankle was swollen and that Oliver reported experiencing "pretty significant" pain. Doc. 42-5 at 4, 7. Oliver was given hydrocodone, a pain medication, and shortly thereafter Oliver reported his pain level had decreased. Doc. 42-5 at 4. X-rays of Oliver's ankle were taken, and upon review of those x-rays, PA Urban discovered a fracture.[6] Doc. 42-5 at 2. PA Urban testified that "a fractured bone is a very obvious source of pretty intense pain and most patients need something stronger than over-the-counter pain medicine." Doc. 42-5 at 6. A fractured ankle will cause swelling, no matter what precautions are taken, but swelling is reduced with ice application and elevation. Doc. 42-5 at 6. PA Urban also testified that had another person diagnosed Oliver's ankle as sprained that the diagnosis would be wrong, but not unreasonable. Doc. 42-5 at 7. PA Urban places a posterior lower leg splint on Oliver's right ankle with assistance from Dr. Melissa Bartling. Doc. 42-5 at 1, 3. Oliver was directed not to bear weight on his ankle and to apply ice in twenty minute intervals to reduce swelling. Doc. 42-5 at 3. Because Gregory is a small, rural community, PA Urban had the x-rays sent to CORE Orthopedics Avera Medical Group in Sioux Falls, South Dakota on Monday, September 10, 2012, to be examined by an orthopedic doctor; Oliver was scheduled to see an orthopedic surgeon in Gregory on the following Thursday, September 13, 2012. Doc. 42-5 at 2, 9.

PA Urban also testified about the potential effects of delay in treating an injured ankle. Doc. 42-5 at 3, 7. According to PA Urban, a twenty-four hour delay in treatment of Oliver's ankle could create adverse effects if Oliver walked on his ankle during that time, but that it was also possible that the condition of his ankle would not change. Doc. 42-5 at 3. PA Urban found

---

[6]Orthopedic doctors later confirmed that Oliver suffered from a distal fibula fracture. Doc. 42-5 at 12–13.

8

it difficult to determine whether adverse effects resulted in Oliver's case without comparing an x-ray taken at the time of the injury with an x-ray taken after a twenty-four hour delay of treatment. Doc. 42-5 at 3. PA Urban testified about her experience, that casting is always delayed because of swelling and that an orthopedic surgeon never puts a permanent cast on immediately, or even within a few days of injury, because swelling can continue to increase and cause an individual's blood circulation to be cut off. Doc. 42-5 at 7. Thus, had Oliver arrived at the emergency room a day earlier, PA Urban testified that Oliver still would have received the same treatment—a temporary splint rather than a cast. Doc. 42-5 at 3, 7.

One of Oliver's expert witnesses, Dr. Christopher Fromm, an emergency room physician for the Spearfish Regional Hospital, opined that Oliver suffered unnecessarily during his incarceration on September 8 and 9, 2012. Doc. 78 at 1. In Dr. Fromm's expert opinion, Oliver "could have received an ice pack and been instructed to keep his right ankle elevated." Doc. 78 at 1. Additionally, the WCJ staff could have provided Oliver with over-the-counter pain medication to reduce his pain while in their custody. Doc. 58-12 at 6–7. Dr. Fromm testified that anti-inflammatories such as Tylenol and Motrin can be given to someone with a blood alcohol content level of .026, which was Oliver's blood alcohol level at 1:00 p.m. on September 8, 2012. Doc. 58-12 at 6–7. Obtaining immediate medical attention is important, in Dr. Fromm's expert opinion, because it would "prevent complications, further injury, and unnecessary pain and suffering." Doc. 78 at 1.

Oliver's second expert witness, Scott Schuft ("Schuft"), evaluated the WCJ's policies and procedures.[7] Docs. 42-9, 58-10, 79. After reviewing depositions, discovery, and the WCJ's

---

[7] The Winner Defendants object to Schuft's testimony claiming that he "is not qualified to give this type of expert opinion." Doc. 68 at 3. Schuft has worked for several years at the Pennington County Jail, a jail located in Rapid City that is substantially larger than the WCJ. Doc. 79 at 1.

policies and procedures, Schuft opined that the WCJ staff, administration, Deputy Drey, and Officer Claussen[8] failed to comply with the WCJ's own policies and procedures when dealing with Oliver and that the WCJ staff, Deputy Drey, and Officer Claussen failed to provide Oliver adequate medical care. Doc. 79 at 2. Schuft outlined that "Winner policy F (regulations) 10 (healthcare) (WO167) ["(Winner Policy F.10")"] clearly states that prior to admission of an inmate the correctional officer shall conduct a preliminary health evaluation" and that the evaluation should include "any notations of body deformities, trauma markings, bruises, lesions, ease of movement and jaundice." Doc. 79 at 2. Schuft also noted that Winner Policy F.10 allows for a "total rejection of an inmate due to serious illness or injury," and "also states that in case of an injury or illness the staff is to consult the Winner hospital or [emergency room] for instructions." Doc. 79 at 2. Schuft reasoned that Oliver was not provided adequate medical care and that policies and procedures of the WCJ were not followed because the WCJ staff "accepted the word and assessment of Deputy Drey," did not conduct its own independent examination of Oliver, did not complete a preliminary health evaluation of Oliver at the time of his admission, and did not contact the Winner emergency room during Oliver's stay for instruction. Doc. 79 at 2.

Schuft also reported that in his expert opinion, the administration of the WCJ failed to adequately train, supervise, or control WCJ jail staff, which resulted in a violation of Oliver's rights as an inmate. Doc. 79 at 3. According to Schuft, the WCJ staff who had contact with Oliver "did not understand their professional responsibilities and duties as provided by the [WCJ's] own policies and procedures as would be expected by national standards for correctional facilities." Doc. 79 at 3. Schuft further noted that there is no annual training

---

[8]Neither Deputy Drey nor Officer Claussen, however, are WCJ employees.

provided to WCJ staff on WCJ policies and procedures; one of the WCJ correctional officers, Mach, testified that over her five and one-half year employment she cannot remember the last time she was required to read the policy manual. Doc. 42-8 at 1, 5; 79 at 3. In Schuft's expert opinion, those parties who were deposed regarding Oliver's incarceration on September 8 and 9, 2012, including staff and administrators,[9] failed to recognize their own violations of policies; that failure, Schuft concluded, "give[s] rise to the inference that a pattern exists" that inmates are being denied the right to medical care while at the WCJ and that the failures in Oliver's case "were so systemic" that they cannot be viewed as a mere oversight. Doc. 79 at 3. Schuft also testified that, in his opinion, the policies and procedures adopted by the WCJ are not satisfactory. Doc. 42-9 at 2. According to Schuft, the WCJ policies and procedures should include more specifics in the provisions addressing training, information in activity logs, what inmates are provided, and medical care, such as detoxification. Doc. 42-9 at 2. Schuft reached this opinion by comparing the WCJ's policies and procedures to the American Correctional Association Core Jail Standards ("ACA Core Jail Standards").[10] Doc. 42-9 at 2.

## IV. DISCUSSION

### A. Constitutional Standard

Oliver asserts that his Fifth, Eighth, and Fourteenth Amendment rights were violated after his arrest and while detained at the WCJ. "Although 'the Eighth Amendment has no application'

---

[9]Jail staff and administrators not previously identified in this opinion and listed in Schuft's expert report include the following: Lori Kalenda, jail administrator, Doc. 54 at 1; Paul Schueth, Chief of Police for the City of Winner, which owns and operates the WCJ, Doc. 56 at 1; Justin Peterson, jail staff, Doc. 58-8 at 3; Doug Gossard, jail staff, Doc. 58-7 at 3–4; and three individuals whose specific positions are not clear in the record—Chris Davidson, Trent Sinclair, and Damon Wolf. Doc. 79 at 1.

[10]The Winner Defendants object to Schuft's use of the ACA Core Jail Standards because "there is no evidence the City of Winner is required to have formal policies. The ACA [Core Jail Standards] is irrelevant, since the City of Winner is not ACA certified, and has never so requested." Doc. 68 at 2.

11

until there has been a 'formal adjudication of guilt,' the Fourteenth Amendment gives state pretrial detainees—just as the Fifth Amendment gives federal pretrial detainees—rights which are '*at least as great* as the Eighth Amendment protections available to a convicted prisoner.'" Walton v. Dawson, 752 F.3d 1109, 1117 (8th Cir. 2014) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)); see also Christian v. Wagner, 623 F.3d 608, 613 (8th Cir. 2010) (noting that the Eighth Amendment does not apply to pretrial detainees but that "the Due Process Clause of the Fourteenth Amendment imposes analogous duties on jailers to care for detainees"); Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007) (noting change of analysis, however, "makes little difference as a practical matter"). When the alleged deprivation occurred, Oliver had not been arraigned or convicted, thus the Due Process Clause required that he "not be punished."[11] Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979).

**B. Individual Capacity Liability**

Under the Due Process Clause, a governmental entity detaining someone like Oliver must provide pretrial detainees with appropriate medical care. City of Revere, 463 U.S. at 244. In order to show that Deputy Drey, Officer Claussen, and Stenson individually failed to provide Oliver adequate medical treatment, Oliver must prove "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011); see also Letterman v. Does, 789 F.3d 856,

---

[11]Only cases decided before Oliver's detention in September 2012 are pertinent to a qualified immunity analysis. However, case law since 2012 has reaffirmed and clarified that pretrial detainees such as Oliver are not subject to being punished. See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475 (2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically." (quotation omitted)); Walton, 752 F.3d at 1117 ("The Constitution shield[s] [pretrial detainees] not only from 'cruel and unusual punishment,' but from *any* punishment whatsoever." (internal quotation omitted)).

861–62 (8th Cir. 2015) (noting the first element is objective and the second is subjective); Hall v. Ramsey Cty., 801 F.3d 912, 920 (8th Cir. 2015).[12]

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). Here, Oliver was not diagnosed by a physician until after he posted bond and was released. Therefore, Oliver's condition while in custody must have been so obvious that a layperson would easily recognize the need for treatment.

The determination whether a medical need is sufficiently obvious requires an analysis of the defendants' background knowledge. Jones, 512 F.3d at 482. The Eighth Circuit has found a serious medical need that was obvious to a layperson where an inmate: complained of pain and complications eating food due to a broken jaw that appeared to jailers as deformed and "far out of place," see Wise v. Lappin, 674 F.3d 939, 940–41 (8th Cir. 2012) (per curiam); was pregnant, bleeding, and passing blood clots, see Pool v. Sebastian Cty., Ark., 418 F.3d 934, 945 (8th Cir. 2005); had swollen and bleeding gums and complained of extreme tooth pain, see Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004); experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to known diabetes, see Roberson v. Bradshaw, 198 F.3d

---

[12]In Kingsley v. Hendrickson, the Supreme Court of the United States held that a pretrial detainee need only show that the defendant-official's use of force was objectively unreasonable in a § 1983 case alleging excessive force. 135 S. Ct. at 2470. That holding, however, was limited to excessive force cases under the Fourteenth Amendment. Id. at 2476. Thus, the Eighth Circuit still utilizes the subjective measure of deliberate indifference as set forth in Farmer v. Brennan, 511 U.S. 825 (1994), for pretrial detainees in Fourteenth Amendment cases involving an allegation of deprivation of medical care. See Hall, 801 F.3d at 917 n.3, 920 (noting Kingsley's holding in discussion of pretrial detainee's excessive force claim and then applying subjective prong of deliberate indifference to same pretrial detainee's deprivation of medical care claim).

645, 647–48 (8th Cir. 1999); or exhibited signs of early labor and the inmate's medical records clearly documented a history of rapid labor and delivery, see Coleman, 114 F.3d at 785. Conversely, the Eighth Circuit has found a serious medical need is not obvious to a layperson where: an overweight inmate was unable to stand or walk, was unresponsive and "google-eyed," was rolling on the ground and groaning, and was breathing rapidly, but did not request medical attention, see Jones, 512 F.3d at 482–83; and a pretrial detainee, who was found soaking wet in a creek, was combative, gave nonsense answers to questions, began screaming in holding cell, and officers were aware detainee was under the influence of methamphetamine, see Grayson v Ross, 454 F.3d 802, 809–10 (8th Cir. 2006).

The Gregory Defendants and the Winner Defendants argue that Oliver did not suffer from an objectively serious medical need and base those arguments on the testimony of Deputy Drey, Officer Claussen, and Stenson. Doc. 37 at 6; Doc. 59 at 15. The Gregory Defendants contend that neither officer subjectively believed medical attention to be required because Oliver walked to the patrol vehicle while putting weight on both legs. Doc. 37 at 7. However, Oliver testified to the contrary that he could not put weight on his ankle and that the officers had to help him to the vehicle. Doc. 42-3 at 3. The Winner Defendants argue that Oliver did not suffer from an objectively serious medical need because Stenson was unaware of any serious medical condition Oliver might have suffered from, made no observations of Oliver's ankle, and never was told that Oliver's ankle hurt. Doc. 59 at 15–16. However, Oliver testified that he was wheeled in to the WCJ because he could not walk and that while Stenson was booking him he said that his ankle hurt and he needed a doctor. Doc. 58-11 at 13.

In order to find as a matter of law that Oliver did not suffer from an objectively serious medical need as the Gregory Defendants and the Winner Defendants contend, this Court must be

14

convinced that no reasonable jury would find that Oliver's condition was so obvious that a layperson would easily recognize the need for medical treatment. This is a close question, in that Oliver's ankle was not bleeding, no bones were protruding, the ankle was not in an unnatural position, and a lay person rationally could have wrongly thought the ankle to be sprained. But when viewing the facts in a light most favorable to Oliver, and not merely crediting the individual accounts of Deputy Drey, Officer Claussen, or Stenson, a reasonable jury could find that Oliver suffered from an objectively serious medical need. Oliver testified that he told the officers he thought his ankle was broken, that the officers lifted him off the ground and carried him—their arms under his shoulders—to the patrol vehicle, and that he did not put any weight on his right leg other than his touching his toe to the ground to maintain balance. After both officers observed Oliver's swollen ankle and stated that they believed Oliver's ankle was sprained, the officers transported Oliver to the WCJ. At the jail, Oliver did not put any weight on his right leg and had to be wheeled into the booking area in a wheeled chair. Stenson was present at the WCJ when Oliver was wheeled into the booking area. Oliver then testified he told Stenson that his ankle hurt and he needed to see a doctor. Taking the facts in the light most favorable to Oliver, Oliver's complaints of pain, requests for medical attention, refusal or reluctance to bear weight on his right leg and ankle, and presence of swelling observable at the scene and in the booking area, could cause a reasonable jury to find that Oliver's ankle condition was sufficiently obvious that a layperson would easily recognize the need for medical treatment. See Johnson v. Hamilton, 452 F.3d 967, 971–73 (8th Cir. 2006) (finding fractured finger was an objectively serious medical need where nurse told prisoner that because his finger was swollen he had probably sustained fracture); Plemmons v. Roberts, 439 F.3d 818, 823–24 (8th Cir. 2006)

(finding objectively serious medical need where pretrial detainee told the booking officer he was a heart patient and shortly thereafter began experiencing common heart attack symptoms).

Even though a reasonable jury could find that Oliver suffered from an objectively serious medical condition, Oliver must then establish deliberate indifference, which requires Oliver demonstrate that the defendants knew of and disregarded an excessive risk to his health or safety. Letterman, 789 F.3d at 862; see also Farmer, 511 U.S. at 837 (holding "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). "[A]ctual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." Jones, 512 F.3d at 481–82 (citing Farmer, 511 U.S. at 842). "It is sufficient to show that 'the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it.'" Letterman, 789 F.3d at 862 (quoting Farmer, 511 U.S. at 842). If knowledge is shown, the plaintiff must then show the defendants "'knew that their conduct was inappropriate in light of' the risk to the prisoner." Letterman, 789 F.3d at 862 (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)); see also Hall, 801 F.3d at 920.

"Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cnty., S.D., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). However, deliberate indifference is "greater than gross negligence and requires more than mere disagreement with treatment decisions." Id. (quoting Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006)); see also Ruark v. Drury, 21 F.3d 213, 216 (8th Cir. 1994) (stating the delay "must also be prompted by 'obduracy and wantonness, not inadvertence or error in good faith'" (quoting Whitley v. Albers, 475 U.S. 312,

319 (1986))). When evaluating whether a defendant deliberately disregarded a risk, the court considers the "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)).

There is considerable disparity in the testimony and evidence from Oliver, Deputy Drey, and Officer Claussen. Certainly if the testimony of Deputy Drey and Officer Claussen is believed, then they were not deliberately indifferent and indeed lacked knowledge of a serious medical need. However, this Court does not resolve whom to believe when ruling on a summary judgment motion and instead must view the facts in the light most favorable to Oliver even though doing so requires the difficult step of crediting the testimony of an intoxicated arrestee over the testimony of sober public officials. If Oliver is believed, a reasonable jury could find that both Deputy Drey and Officer Claussen were deliberately indifferent to Oliver's medical needs and could infer actual knowledge of a serious medical need because Oliver's medical condition was sufficiently obvious to warrant medical treatment, Jones, 512 F.3d at 481–82 (inferring actual knowledge from fact that serious medical need was obvious), and both officers were exposed to information concerning Oliver's ankle—Oliver's statement that he thought his ankle was broken, his inability to bear weight, and visible swelling—sufficient to show that they "'must have known'" about Oliver's medical need, Letterman, 789 F.3d at 862 (quoting Farmer, 511 U.S. at 842). Continuing to view the evidence and all reasonable inferences in Oliver's favor, a reasonable jury could find that Deputy Drey and Officer Claussen then disregarded an excessive risk to Oliver's health because each chose not to obtain medical treatment for Oliver. Oliver testified that while in the WCJ booking area he said, in the presence of Deputy Drey,

17

Officer Claussen, and Stenson, that his ankle hurt and that he needed to see a doctor. Oliver

testified that Stenson then asked Deputy Drey if Oliver was really hurt, to which Deputy Drey

shook his head and replied, "[N]o, he is not hurt, put him in the jail cell." Officer Claussen was

standing next to Deputy Drey during this exchange and did not correct or object to Deputy

Drey's statement. See Letterman, 789 F.3d at 863 (finding reasonable jury could infer deliberate

indifference where defendant-official knew of the risk to prisoner and did nothing in response).

       The Gregory Defendants argue that the officers did not deny any and all medical care to

Oliver; rather, they "simply made a determination that he did not need emergency care prior to

being transported to the [WCJ]" and that the WCJ had a policy in place which allowed pretrial

detainees to receive medical treatment. Doc. 37 at 9. But a reasonable jury could find that when

Deputy Drey told Stenson that Oliver was not really hurt, and with a silent Officer Claussen

nearby, that both officers knew that their conduct was inappropriate in light of the risk to Oliver.

The Gregory Defendants also argue that any alleged failure of the officers to draw the inference

that a substantial risk of serious harm exists would, at the very worst, have even been negligent

because PA Urban testified that had another person diagnosed Oliver's ankle as sprained that the

diagnosis would be wrong, but not unreasonable. Doc. 37 at 10–11. However, neither of the

officers ever told the WCJ staff that Oliver's ankle was sprained; instead, according to Oliver,

Stenson was told by Deputy Drey, without correction or qualification from Officer Claussen, that

Oliver was not hurt.

       Stenson and Oliver's recollection of events also differ, but when viewing the facts in the

light most favorable to Oliver, a reasonable jury could find that Stenson was deliberately

indifferent to Oliver's medical needs. Actual knowledge could be found by inference, Jones, 512

F.3d at 481–82, and because Stenson also "'must have known'" about Oliver's medical needs

18

because she knew Oliver had to be wheeled into the WCJ with a wheeled chair, and, according to Oliver, while in the booking area and in Stenson's presence he complained of ankle pain and requested to see a doctor, Letterman, 789 F.3d at 862. Stenson was familiar with Oliver from a previous period of incarceration, Doc. 42-7 at 1, and would know that he typically could ambulate. A reasonable jury could then find that Stenson disregarded an excessive risk to Oliver's health because rather than independently assessing Oliver's condition, she purportedly accepted Deputy Drey's statement: "[N]o, [Oliver] is not hurt, put him in the jail cell." Moreover, knowing that Oliver had to be wheeled into the booking area because he would not walk on his leg and after hearing Oliver's complaints of ankle pain and requests for medical attention, Stenson did not complete a medical questionnaire for Oliver. Stenson was with Oliver for sufficient time for her to have completed the medical questionnaire and to have independently observed Oliver's ankle which, according to Oliver, was visibly swollen. Instead, Stenson completed a brief intake, assigned Oliver a holding cell, and made no further contact with Oliver over the next one-and-one-half hours until her shift ended.

The Winner Defendants argue that even if Stenson was negligent, such conduct does not amount to deliberate indifference and cite to three cases for that proposition, Scott v. Coleman, 439 F. App'x 783 (11th Cir. 2011) (per curiam), Raheem v. Stout, 101 F. App'x 603 (6th Cir. 2007), and Loukas v. Gundy, 70 F. App'x 245 (6th Cir. 2003). Doc. 59 at 17–18. Even though each of those cases involve an ankle injury of some degree, all are distinguishable from Oliver's case for two reasons. First, all of the petitioners in those cases were convicted prisoners, not pretrial detainees. Second, each prisoner was eventually provided some form of medical treatment, ranging from medical examinations, x-rays, and castings to accesses to pain medications, crutches, and bandage wraps for swelling. See Scott, 439 F. App'x at 784, Raheem,

19

101 F. App'x at 604; Loukas, 70 F. App'x at 246.  In this case, Oliver was not provided any medical treatment at the WCJ.  A reasonable jury could find that Stenson's inactions were more than merely negligent, but amounted to deliberate indifference of Oliver's medical needs.  See Plemmons, 439 F.3d at 824–25 (affirming denial of summary judgment where pretrial detainee alleged prison officials delayed medical treatment of objectively serious medical need after pretrial detainee told prison officials about past medical problems and requests for medical assistance and symptoms were ignored).

Both the Gregory Defendants and the Winner Defendants assert that Oliver's § 1983 claim should be precluded because Oliver has failed to offer evidence that a delay in treatment had a detrimental effect on his condition.  Doc. 37 at 11–14; Doc. 59 at 18–23.  "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'"  Coleman, 114 F.3d at 784 (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)).  "An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs."  Id.  The Winner Defendants further argue that Oliver may only present evidence to prove a detrimental effect from an expert—that is, only evidence from PA Urban and not evidence from Oliver himself—because Oliver suffered from a "'sophisticated medical condition.'"  Doc. 59 at 20 (quoting Alberson v. Norris, 458 F.3d 762, 765–66 (8th Cir. 2006)).  Oliver counters that, although his ankle condition is a sufficiently serious injury, it is not a sophisticated condition.  Doc. 44 at 9.

Although the parties argued Oliver's case as if it were a delay in medical treatment case, Oliver's case actually involves denial of medical treatment by the Defendants, not a delay in the

Defendants providing treatment. The Gregory Defendants and the Winner Defendants each acknowledge that they did not provide Oliver any medical treatment on September 8 or 9, 2012. See Doc. 37 at 3, 9–10; Doc. 59 at 5–6, 16. Furthermore, Oliver's complaint alleges refusal, not delay, of medical treatment. Doc. 1 at ¶¶ 17, 19, 22. A reasonable jury could find that both the Gregory Defendants and the Winner Defendants were deliberately indifferent to Oliver's medical needs without considering evidence of the effect of delay. Therefore, summary judgment for Deputy Drey, Officer Clausen, and Stenson in their individual capacities is denied.

### C. Qualified Immunity

"On summary judgment, a defendant official is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" Walton, 752 F.3d at 1116 (quoting Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)). If a § 1983 plaintiff fails to establish either prong—and the court may consider one without the other—qualified immunity shields the officials from suit. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). But a district court "may not deny qualified immunity without answering both questions in the plaintiff's favor." Walton, 752 F.3d at 1116; see also Pearson, 555 U.S. at 236. As explained above, the facts, viewed in the light most favorable to Oliver, demonstrate that Deputy Drey, Officer Claussen, and Stenson in their individual capacities were each deliberately indifferent to Oliver's medical needs. See Letterman, 789 F.3d at 861 (providing that a defendant-official "who is deliberately indifferent to the medical needs of a prisoner violates the prisoner's constitutional rights"). Thus, the remaining inquiry is whether that right was clearly established.

The Supreme Court of the United States has "repeatedly told courts . . . not to define clearly established law at a high level of generality." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084 (2011)). For example, it is not enough that the right to be free from punishment for pretrial detainees under the Due Process Clause be clearly established as of September 8 and 9, 2012. See Kahle, 477 F.3d at 552–53 (prohibiting the same kind of generality, but in the context of the Eighth Amendment); see also Langford v. Norris, 614 F.3d 445, 461 (8th Cir. 2010) (stating the inquiry requires more than an abstract determination). Rather, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" Mullenix, 136 S. Ct. at 308 (quoting Ashcroft, 131 S. Ct. at 2084). "In determining whether a right is clearly established, [the court asks] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Thompson v. King, 730 F.3d 742, 750 (8th Cir. 2013). This question does not require a case directly on point, but requires an examination of precedent and whether the law provided the officers with fair warning that their conduct was impermissible. Id.; see also Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam) (noting precedent must have placed the "constitutional question beyond debate"). "To overcome qualified immunity, a plaintiff typically must identify either 'cases of controlling authority in their jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" Jacobson v. McCormick, 763 F.3d 914, 918 (8th Cir. 2014) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). Officials are not liable, however, "for bad guesses in gray areas; they are liable for transgressing bright lines." Jones, 512 F.3d at 484; see also Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (per curiam) ("Qualified immunity gives government officials breathing room to make reasonable but

mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." (citation and internal quotation marks omitted)).

The Gregory Defendants argue that the amount of time it would have taken Deputy Drey and Officer Claussen to take Oliver to the Winner emergency room[13] versus the amount of time it took to the officers to transfer custody of Oliver to the WCJ—a short delay of less than one hour—for what the "officers perceived to be a sprained ankle is at odds with the established case law and has not been established." Doc. 37 at 18–19. Although a delay of mere minutes could constitute deliberate indifference if a detainee was unresponsive—i.e., not breathing—and that an unexplained delay of hours for a serious injury may state a *prima facie* case, the Gregory Defendants claim that no court has held as such for an ankle injury akin to Oliver's. Doc. 37 at 19. The Gregory Defendants cite to an Eleventh Circuit Court of Appeals case, Andujar v. Rodriguez, 486 F.3d 1199, 1204–05 (11th Cir. 2007), finding qualified immunity to apply to paramedics where there was a two-hour delay in medical treatment for a pretrial detainee's dog bite wounds. Doc. 37 at 19–20. In that case, the dog bite wounds were serious, covering both the front and back of the pretrial detainee's thigh, but were not urgent because the pretrial detainee's condition and vitals were stable. Id. at 1203–04. But Andujar did not grant qualified immunity to law enforcements officers as the Gregory Defendants state; rather, the defendants in Andujar were paramedics. Id. at 1205. Part of the court's reasoning for allowing the paramedics to be shielded by qualified immunity included the fact that paramedics have to "release the detainee to police officers for booking" and that paramedics rely "on the police officers to later transport the detainee for further treatment." Id.

---

[13]The Winner emergency room was approximately six blocks from the WCJ. Doc. 42-6 at 11.

The Gregory Defendants also assert that the Eighth Circuit has found that a defendant-official was not deliberately indifferent to a pretrial detainee's medical needs for a less than twenty-four hour delay in treatment of a broken jaw, Jenkins v. Cty. of Hennepin, 557 F.3d 628, 632 (8th Cir. 2009), and no deliberate indifference was found for a defendant-official's several day delay for medical treatment of a prisoner's fractured finger. Johnson, 452 F.3d at 973. Doc. 47 at 7. Jenkins, however, is also distinguishable from Oliver's case. Jenkins involved a pretrial detainee who was assessed by two nurses, one of whom reported to the named-defendant and supervisory nurse that the pretrial detainee was unable to open his jaw and that his jaw was swollen. 557 F.3d at 630–31. Based on that report, the supervisory nurse decided to send the pretrial detainee to a medical center for x-rays, which ultimately occurred less than twenty-four hours later. Id. at 631–32. Unlike Jenkins, the officers did not delay in providing treatment; they provided no medical attention to Oliver. According to Oliver, both officers failed to share information at the WCJ about Oliver's ankle injury, and one officer in front of the other purportedly told Stenson that Oliver was not injured and should be put in the cell. Johnson also does not advance the Gregory Defendants' argument. In Johnson, the Eighth Circuit found that a fractured finger was an objectively serious medical need, but did not find deliberate indifference because the one-month delay of treatment was the result of only ordinary negligence. 452 F.3d at 971–93. As discussed above, if Oliver's testimony is believed, Deputy Drey and Officer Claussen were not merely negligent, but were deliberately indifferent to Oliver's medical needs.

A reasonable officer in either Deputy Drey or Officer Claussen's position on September 8, 2012, would have known that exhibiting deliberate indifference to Oliver's serious medical needs was unlawful. At the time of Oliver's arrest, it was clearly established that knowledge of a pretrial detainee's need for medical care and intentional refusal to provide that care constituted

24

deliberate indifference. See, e.g., Estelle v. Gamble, 429 U.S. 97, 104 (1976) (providing that the cruel and unusual punishment provision of the Eighth Amendment obligates officials to provide pretrial detainees medical care); Plemmons, 439 F.3d at 823 (same); Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001) (same); see also Kahle, 477 F.3d at 553 (providing that whether the right was clearly established, even if abstractly stated, is still a factor for the court to consider). Second, no reasonable law enforcement officer in Deputy Drey or Officer Claussen's position, taking the evidence most favorable to Oliver, could have concluded on September 8, 2012 that it would be lawful to refuse medical treatment, or alternatively fail to advise the WCJ of the need to evaluate Oliver's ankle injury, to a pretrial detainee who reported a belief that he had a broken ankle, was complaining of pain, could not bear weight on the ankle, requested medical attention, and had a visibility swollen ankle. Johnson, 452 F.3d at 971–73 (finding fractured finger was an objectively serious medical need); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam) (broken foot constitutes a serious medical need). Instead, Deputy Drey reportedly told Stenson, "[N]o, he is not hurt, put him in the jail cell," and Officer Claussen remained silent during that conversation.

Qualified immunity should similarly not be afforded to Stenson because a reasonable prison official in Stenson's position on September 8, 2012, would have known that exhibiting deliberate indifference to Oliver's serious medical needs was unlawful.[14] The Eighth Circuit and other federal courts have required that pretrial detainees receive adequate medical care. See, e.g., City of Revere, 463 U.S. at 244–45; Estelle, 429 U.S. at 104–05; Coleman, 114 F.3d at 784. Additionally, it was clearly established that it is unlawful for a prison official to

---

[14]The Winner Defendants did not argue that the right was clearly established; rather, counsel argues that the first prong—i.e., deliberate indifference—is not present, and therefore qualified immunity should be allowed. Doc. 59 at 26–27; Doc. 70 at 4–5.

intentionally deny or delay a pretrial detainee access to medical care, and an unexplained delay of hours in treating a serious injury may constitute deliberate indifference. See, e.g., Estelle, 429 U.S. at 104–05 (citing Aldridge v. Montgomery, 753 F.2d 970, 972–73 (11th Cir. 1985) (two and one-half hours); Fitzke v. Shappell, 468 F.2d 1072 (6th Cir.1972) (twelve hours); and Hughes, 295 F.2d at 495 (thirteen hours)). Here there was not just a delay; there was a complete absence of providing any medical attention to Oliver during his day-and-a-half stay at the WCJ. Viewing the facts in the light most favorable to Oliver, Stenson was deliberately indifferent to Oliver's medical needs. Therefore, Stenson is not afforded qualified immunity because the state of the law on September 8, 2012 gave her fair warning that her alleged deliberate indifference to Oliver's medical needs was unconstitutional.

### D. Official Capacity, County, and City Liability

Oliver asserts that the County of Gregory, the City of Gregory, and the City of Winner "failed to train and supervise deputies, police officers, and jailers in the proper handling of detainees who require medical care or assistance." Doc. 1 at 3. Oliver also has sued Deputy Drey, Officer Claussen, and Stenson in their official capacities. Doc. 1. The Eighth Circuit has noted that "[a] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)). Thus, for liability to attach to the municipalities and to officials in their professional capacity, Oliver must prove that each "municipality *itself* caused the constitutional violation at issue." Id. (quotation omitted).

"In general, 'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents' on a respondeat superior theory of liability." Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quoting Monnell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658,

694 (1978)); see also Bd. of Cty. Comm'rs of Bryan Cty., Okla., v. Brown, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). A local government may be liable in limited circumstances such as inadequate employee training, but liability will attach "only where the failure to train amounts to deliberate indifference."[15] City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). The Eighth Circuit has stated that a municipality may be liable for failure to train under a three-part showing where "(1) the municipality's training practices were inadequate; (2) the municipality was deliberately indifferent to the constitutional rights of others, such that the 'failure to train reflects a deliberate or conscious choice' by the municipality; and (3) an alleged deficiency in the training procedures actually caused the plaintiff's constitutional injury." Rodgers v. Knight, 781 F.3d 932, 942 (8th Cir. 2015) (internal quotation marks omitted) (quoting City of Canton, 489 U.S. at 388–91), cert. denied, 2015 WL 4515449. Deliberate indifference "as applied to a municipality in the Fourteenth Amendment context" differs from the subjective inquiry of individuals officials; here, the analysis is "purely objective: 'liability [may] be premised on obviousness or constructive

---

[15]The Winner Defendants urge this Court to dismiss the City of Winner on the ground that a § 1983 action cannot be brought against an entity. Doc. 59 at 11–14. But Monnell and its progeny, allow a local government, such as the City of Winner, to be sued under § 1983 when the "policy or custom" inflict the constitutional injury. 436 U.S. at 694. See also Erwin Chemerinsky, Federal Jurisdiction §§ 8.5.1–8.5.5 (6th ed. 2012) [hereinafter Chemerinsky] (collecting cases, outlining municipal liability in § 1983 actions in federal court, and listing ways cities may be liable for constitutional violations resulting from their official policies and customs). And although the Eleventh Amendment prohibits citizens from suing a state for money damages in federal court, Hopkins v. Saunders, 93 F.3d 522, 526 (8th Cir. 1996), the Eighth Circuit found, in a similar case to Oliver's, that the Eleventh Amendment did not bar a pretrial detainee's § 1983 claim against three correctional employees in their official capacities because, in § 1983 actions and within the meaning of the Eleventh Amendment, a suit against the county is not construed as a suit against the state, Reehten v. Buck, 163 F.3d 602 (8th Cir. 1998) (unpublished decision) (citing Greenwood v. Ross, 778 F.2d 448, 453 (8th Cir. 1985)).

notice.'"[16] Walton, 752 F.3d at 1117 (emphasis omitted) (quoting Farmer, 8511 U.S. at 841); see also City of Canton, 489 U.S. at 390; Connick v. Thompson, 563 U.S. 51, 61–62 (2011) (providing that a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.' (quoting City of Canton, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part))).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 563 U.S. at 62 (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okla., 520 U.S. at 409). However, the Supreme Court of the United States acknowledged that there could be instances where a single incident might be a basis for showing deliberate indifference, but such a circumstance must fall within a "narrow range of 'single-incident' liability." Connick, 563 U.S. at 54, 71 (finding that district attorney's office may not be held liable under § 1983 for a failure to train based on a single Brady violation); see also City of Canton, 489 U.S. at 390 n.10 (1989) (finding that a failure to provide adequate training in light of foreseeable consequences, such as law enforcement's use of firearms or deadly force, or a city's failure to act in response to repeated complaints of constitutional violations could constitute deliberate indifference). In determining

---

[16]The Eighth Circuit recently clarified the difference analyses of deliberate indifference when the plaintiff is a pretrial detainee, as compared to an already incarcerated inmate, and explained further as follows:

> We recognize the potential inconsistency this approach creates: the same claim (failure to train) by the same plaintiff (a pretrial detainee) arising under the same constitutional provision (the Due Process Clause of the Fourteenth Amendment) uses the same standard (deliberate indifference) in different ways depending on whether the defendant is the municipality or its employee. Theoretically, this could make a municipality liable for a risk it *should have* known even if all of its employees in supervisory roles *did not* know of the risk and are thus not liable.

Walton, 752 F.3d at 1118.

whether a municipality may be liable, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton, 489 U.S. at 390–91.

Oliver's allegations that the City of Gregory and the County of Gregory have a policy of inadequate training and supervision fail because he has not presented evidence that those local governments' policies were inadequate or that the local governments' failure to train amounts to deliberate indifference. Oliver argues, however, that "'[n]o policy' is a 'policy' in and of itself, as well as a 'custom,'"[17] and posits that the absence thereof may serve as the basis for municipal liability. Doc. 62 at 7–8. But, as stated above, Oliver has not presented any evidence that the City of Gregory or County of Gregory lacked policies. For example, Oliver did not depose local officials about the presence or absence of a policy which would cover how police officers should handle pretrial detainees who require medical care. As a consequence, there is no evidence in the record that would support Oliver's theory that the lack of policies or training procedures for Deputy Drey or Officer Claussen actually caused Oliver's constitutional injury or that Oliver's claims against the City of Gregory and County of Gregory are anything other than seeking to impose respondeat-superior liability. Mettler, 165 F.3d at 1204 (finding plaintiff presented no policy argument because plaintiff did not identify any official policy that arguably played a role

---

[17]Courts do "not use the terms 'policy' and 'custom' interchangeably when conducting a Monnell analysis." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). In Oliver's case, the "policy" alleged is a policy of inadequate employee training. See Rodgers, 781 F.3d at 942. A custom, however, which is not alleged in Oliver's Complaint, see Doc. 1, requires proof of a "continuing widespread, persistent pattern or unconstitutional misconduct." Jenkins, 557 F.3d at 634; see also Chemerinsky, supra, § 8.5.2 (distinguishing between a policy of inadequate training and supervision and custom as two separate theories of liability against municipalities in § 1983 actions).

in the alleged constitutional violation). Therefore, summary judgment is proper for the City of Gregory and the County of Gregory, and because these entities caused the alleged violation, summary judgment is also proper for both Deputy Drey and Officer Claussen in their official capacities. Elder-Keep, 460 F.3d at 986.

Oliver has, however, supported his claim—albeit marginally—against the City of Winner and against Stenson in her official capacity. While it is hard to reconcile Oliver's argument that there are no policies on the one hand, with the testimony of Oliver's expert that the policies are insufficient on the other, a reasonable jury could find that the City of Winner had inadequate policies and training if it accepts Schuft's expert testimony. And viewing the evidence in a light most favorable to Oliver, a reasonable jury could find that the City of Winner at least had constructive notice or should have known that its officers were intentionally denying or delaying pretrial detainees medical care and that its failure amounts to deliberate indifference. Schuft outlined that WCJ policies and procedures are not followed, namely preliminary health evaluations are not always completed prior to a detainee's admission and that the Winner hospital or emergency room is not contacted for instruction when a detainee presents himself or herself to the WCJ with an injury or illness. Schuft further noted, and Oliver presented testimony from at least one correctional officer, Mach, that there appears to be no ongoing training on the WCJ policies and procedures. Additionally, a reasonable jury (if the facts are viewed most favorably to Oliver) could find that had the City of Winner sufficiently implemented a training program addressing pretrial detainees' medical needs, Oliver's constitutional injury would not have occurred. See City of Canton, 489 U.S. at 391 (requiring that the court determine causation by "[p]redicting how a hypothetically well-trained officer would have acted under the circumstances"). Taking all reasonable inference in Oliver's favor,

the City of Winner's alleged shortcomings appear to present more than mistakes from an individual officer.    Finally, Oliver's claim against the City of Winner survives summary judgment as a single-incident case because a city's failure to train officials on what procedures should be followed at a jail for a pretrial detainee's medical needs would invite foreseeable consequences such as civil suits.   See id. at 390 n.10.   Because a reasonable jury could find that the City of Winner itself caused Oliver's constitutional violation, liability also attaches to Stenson in her official capacity.   Elder-Keep, 460 F.3d at 986.

## V.  CONCLUSION

Therefore, it is hereby

ORDERED that the Gregory Defendants' Motion for Summary Judgment, Doc. 36, is granted in part and denied in part.   Summary judgment enters on all claims against the Gregory Defendants except the § 1983 claims against Deputy Drey and Officer Claussen in their individual capacities.   It is further

ORDERED that the Winner Defendants' Motion for Summary Judgment, Doc. 50, is granted in part and denied in part.   Summary judgment enters on all claims against the Winner Defendants except the § 1983 claims against Stenson in her individual and official capacity and the § 1983 claim against the City of Winner.   It is further

ORDERED that consistent with the stipulation of the parties, all John and Jane Doe defendants are dismissed.   It is finally

ORDERED that the counsel cooperate with the Court to set a trial date, pretrial conference date, and deadline for filing requested jury instructions, witness lists, exhibit lists, and motions in limine.

DATED this **6**ᵗʰ day of January, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

32