# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

## CENTRAL DIVISION

| | |
|---|---|
| SCOTT OLIVER, | 3:14-CV-03013-RAL |
| Plaintiff, | |
| vs. | |
| COUNTY OF GREGORY; CITY OF GREGORY; CITY OF WINNER; DEPUTY TIM DREY, individually and in his official capacity; OFFICER SHAWN CLAUSSEN, individually and in his official capacity; LAKIN STENSON, individually and in her official capacity; and JOHN AND JANE DOES 1-4, individually and in their official capacities, | AMENDED OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| Defendants. | |

On January 6, 2016, this Court entered an Opinion and Order Granting in Part and Denying in Part Defendants' Motions for Summary Judgment ("Opinion and Order"). Doc. 80. Nine days later, the United States Court of Appeals for the Eighth Circuit issued an opinion in Bailey v. Feltmann, 810 F.3d 589 (8th Cir. 2016), a factually analogous case which called into question a portion of this Court's Opinion and Order distinguishing between a denial of treatment and a delay of treatment for purposes of evaluating a 42 U.S.C. § 1983 claim for deliberate indifference to a serious medical need. Compare Doc. 80 at 20–21, with Bailey, 810 F.3d at 594.

1

This Court held a telephonic hearing on January 20, 2016, to discuss the situation and possible need to revisit its decision.[1] Counsel agreed to brief the issue of whether this Court should change its ruling in the wake of the Bailey decision. Having considered all additional arguments from the parties, this Court now issues this Amended Opinion and Order Granting Defendants' Motions for Summary Judgment ("Amended Opinion and Order"). Much of this Amended Opinion and Order is identical to what this Court previously issued, although the analysis of the Bailey decision and outcome on some issues is new.

## I. INTRODUCTION

Plaintiff, Scott Oliver ("Oliver"), instituted this action under 42 U.S.C. § 1983 alleging that the Defendants—the County of Gregory, the City of Gregory, the City of Winner, Gregory County Deputy Tim Drey ("Deputy Drey"), City of Gregory Officer Shawn Claussen ("Officer Claussen"), Winner City Jail correctional officer, Lakin Stenson ("Stenson"), and John and Jane Does 1–4—were deliberately indifferent to his serious medical needs after his arrest and during his detention at the Winner City Jail ("WCJ"). Doc. 1. Oliver also alleged state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and negligent training, supervision, and hiring, as well as a punitive damages claim. Doc. 1. The County of Gregory, the City of Gregory, Deputy Drey, and Officer Claussen (collectively "the Gregory Defendants") have filed a motion for summary judgment based upon the merits and on qualified immunity. Doc. 36. The City of Winner and Stenson (collectively "the Winner

---

[1]Under Federal Rule of Civil Procedure 54(b), "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Thus, a motion to reconsider is not necessary because the Court may review the Opinion and Order *sua sponte*.

Defendants") and John and Jane Does 1–4 filed a similar motion for summary judgment. Doc. 50.

Oliver stipulated to dismissal of John and Jane Does 1–4 and at the hearing on the motions did not resist summary judgment for Defendants on his state law claims. Doc. 67. Oliver opposed both motions on the remaining § 1983 claims. See, e.g., Docs. 44, 62, 63. For the reasons explained below, the motions for summary judgment are granted.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 places the burden initially on the moving party to clearly establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, Mo., 415 F.3d 908, 910 (8th Cir. 2005) (stating that nonmovant may not merely rely on allegations or denials). On summary judgment, courts view the evidence and reasonable inferences in the light most favorable to the nonmoving party. Robbins v. Becker, 794 F.3d 988, 992 (8th Cir. 2015).

3

## III. FACTS

At approximately 10:00 p.m. on Friday, September 7, 2012, Oliver arrived at Frank Day's Bar in Dallas, South Dakota and remained there until the bar closed at approximately 2:00 a.m. on Saturday, September 8, 2012. Doc. 38 at ¶¶ 2–3; Doc. 40 at 2. Oliver drank beers while at the bar and was unable to find a ride home when the bar closed. Doc. 38 at ¶¶ 4–5; Doc 39-1 at 3; Doc. 40 at 2. Oliver did not have a coat with him and testified that the weather that night was cold—fifteen or twenty degrees—and windy. Doc. 39-1 at 3–4. Oliver's recollection of the night of September 8, 2012, being so extraordinarily cold is at odds with weather records and the climate of south central South Dakota in early September. Oliver had a personal cell phone with him, but testified that he was unable to contact anyone for a ride home and could not complete calls because he was shaking so badly from the cold. Doc. 39-1 at 3–4.

At approximately 3:00 a.m., Oliver saw a light on in a mobile home located behind Frank Day's Bar where he knew dancers and employees of the bar resided at times. Doc. 38 at ¶¶ 7–8; Doc. 39-1 at 4; Doc. 40 at 2. Oliver decided to knock on the door of the mobile home to ask the individuals inside for help in obtaining a ride. Doc. 39-1 at 4. Oliver knocked for approximately ten minutes without making contact with anyone inside. Doc. 38 at ¶ 9; Doc. 40 at 2. Oliver testified that he again attempted to use his cell phone to call for help but because he was "shaking violently" from the cold he was unable to push buttons on his phone. Doc. 39-1 at 4. Unbeknownst to Oliver, the mobile home occupant and bar employee, Kara Doles ("Doles"), had called law enforcement because Oliver's pounding on the door had caused her to fear for her own safety. Doc. 38 at ¶ 11; Doc. 40 at 2–3.

Oliver then turned to walk down the steps to leave the mobile home's landing and fell. Doc. 38 at ¶ 10; Doc. 40 at 2. Oliver testified he rolled and twisted his right ankle because either

4

he had missed a step or the step had given way. Doc. 39-1 at 5. Oliver was unsure whether he had broken his ankle at that time, but believed his ankle to be severely injured. Doc. 39-1 at 5. While on the ground, Oliver tried to use his cell phone again, but with no success. Doc. 39-1 at 5. Oliver stayed on the ground outside the mobile home and attempted to stay warm. Doc. 39-1 at 5.

Responding to Doles's call, Deputy Drey and Officer Claussen arrived at the scene in the same patrol car and parked approximately ten to fifteen feet from Oliver. Doc. 38 at ¶ 12; Doc. 40 at 3. Deputy Drey approached Oliver and asked him why he was on the ground to which Oliver coarsely replied that he was taking a nap. Doc. 39-1 at 5. The individual accounts of the events following that initial contact differ from one another.

According to Oliver, he told the officers that he thought he broke his ankle and needed to see a doctor. Doc. 39-1 at 5. Oliver testified that Deputy Drey and Officer Claussen then got on each side of him, put their arms under his shoulders, lifted him up off the ground, and that he helped as much as he could by pushing with his left leg. Doc. 39-1 at 5. Oliver testified that he weighed approximately 410 pounds in September of 2012. Doc. 39-1 at 5. Once off the ground, according to Oliver, the officers carried him to the patrol vehicle, their arms still under his shoulders, and he assisted them by placing weight on his left leg and putting his right toe on the ground for balance. Doc. 42-3 at 2–3. Oliver testified that he could not put any weight on his right leg. Doc. 42-3 at 3. Once at the patrol vehicle, Oliver sat in the back seat and positioned himself upright, facing outward from the car. Doc. 39-1 at 9; Doc. 42-3 at 3. His ankle was not bleeding, not pointing in the wrong direction, and not displaced, but according to Oliver, it was discolored and visibly swollen. Doc. 39-1 at 9–10. While sitting in the back of the patrol

5

vehicle, according to Oliver, both Deputy Drey and Officer Claussen looked at his swollen ankle, and the officers said they thought his ankle was sprained. Doc. 39-1 at 9.

Officer Claussen testified that Oliver initially told the officers that he fell off the front porch of the mobile home, hurt his ankle, and needed help getting off the ground. Doc. 39-3 at 2. For that reason, Officer Claussen grabbed one of Oliver's hands and Deputy Drey grabbed the other, and both officers lifted Oliver off the ground. Doc. 39-3 at 2. Officer Claussen testified that both officers continued to hold onto Oliver's arms and elbows (and not under his shoulders) to escort Oliver as a suspect, rather than to assist him, to the patrol car. Doc. 39-3 at 4–5. Officer Claussen testified that Oliver was able to walk to the patrol car without assistance. Doc. 39-3 at 5. Officer Claussen did not testify that he examined Oliver's ankle; rather, he testified that when Oliver was in the back seat of the patrol car, Deputy Drey stood outside the vehicle and spoke with Oliver while Officer Claussen stood behind Deputy Drey. Doc. 39-3 at 2. According to Officer Claussen, Deputy Drey merely told Oliver to "sit tight" and that the officers would be back. Doc. 39-3 at 2.

According to Deputy Drey's account, Oliver told the officers that he fell off the steps, hurt his ankle, and rolled on the ground to the spot where he was found near a tree. Doc. 42-6 at 3. Although both officers assisted Oliver off the ground, Deputy Drey testified that Oliver never stated that he could not get off the ground himself. Doc. 42-6 at 3. Consistent with Officer Claussen's testimony, Deputy Drey testified that once Oliver was standing each officer steadied Oliver to the patrol vehicle, holding onto Oliver's wrists and elbows. Doc. 42-6 at 3. According to Deputy Drey, Oliver "walked just fine" to the patrol car and "seemed to be putting his full weight, which is a lot of weight, on both legs." Doc. 42-6 at 5, 12. When asked whether he

6

looked for any swelling, Deputy Drey testified that the only observations he made of Oliver's ankle occurred when Oliver walked on his ankle to the patrol car. Doc. 42-6 at 10.

Oliver stayed in the patrol car while both officers went to the mobile home to speak with Doles. Doc. 39-3 at 2–3; Doc. 42-6 at 4. After obtaining her statement, Deputy Drey informed Oliver that he was under arrest for disorderly conduct. Doc. 42-6 at 4. Oliver was then transported the twenty-two miles from Dallas to Winner, South Dakota.[2] Doc. 39-3 at 5. According to Deputy Drey, Oliver never complained about his ankle and never asked to go to the hospital during the drive from Dallas to Winner. Doc. 42-6 at 10.

Upon arriving at the WCJ, Deputy Drey and Officer Claussen attempted to remove Oliver from the patrol vehicle, but Oliver said he could not stand on his leg. Doc. 42-6 at 6. Oliver was able to get out of the patrol vehicle but would not walk on his foot, so the WCJ staff, including correctional officer Stenson, provided Oliver a chair with wheels.[3] Doc. 42-7 at 2. Oliver was wheeled into the booking area of the WCJ at approximately 4:21 a.m. Doc. 42-7 at 2; Doc. 60 at ¶ 42; Doc. 63.

Oliver testified that while he, Deputy Drey, Officer Clausen, and Stenson were in the booking area, Oliver said that his ankle hurt and that he needed to see a doctor. Doc. 58-11 at 13. According to Oliver, Stenson then asked Deputy Drey if Oliver was really hurt. Doc. 58-11 at 13. Oliver testified that Deputy Drey shook his head, and said to Stenson, "[N]o, he is not hurt, put him in the jail cell." Doc. 58-11 at 13. Oliver claims that Officer Claussen was standing next to Deputy Drey during this exchange. Doc. 58-11 at 13. According to Stenson, however, Oliver did not tell her that his ankle hurt and did not tell her that he wanted to go to the

---

[2]At that time, Gregory County had a contract with the WCJ which provided that the WCJ would provide jail services to Gregory County. Doc. 60 at ¶ 5; Doc. 63 at 2.

[3]The wheeled chair was the WCJ's "restraint chair," but Oliver was not restrained in any way; it was used because the WCJ did not have a wheelchair available. Doc. 42-7 at 3.

hospital or seek treatment.[4]   Doc. 42-7 at 11.   Deputy Drey and Officer Claussen then relinquished custody of Oliver to the WCJ and had no further contact with him. Doc. 38 at ¶ 23; Doc. 40 at 4.

The WCJ staff determined that Oliver was too intoxicated to be fully booked or to have his mug shot taken, so Stenson proceeded with the intake process because the WCJ had a policy not to release a person until he or she is sober, even if a bond is set. Doc. 41 at ¶ 120; Doc. 42-7 at 4–5; Doc. 68 at 2. Stenson administered a breathalyzer test to Oliver, which revealed a blood alcohol content level of .159. Doc. 42-7 at 5. Stenson entered Oliver's name into the computer system and assigned Oliver to a holding cell.   Doc. 42-7 at 2, 6.   The intake process took approximately fifteen minutes, and no medical questionnaire was completed for Oliver at that time. Doc. 42-7 at 5, 8. Oliver, who was still in the wheeled chair, was then transported to a holding cell. Doc. 42-7 at 11. Stenson testified that she observed Oliver stand up to get out of the chair and assumed that he walked into the holding cell. Doc. 42-7 at 11–12. Stenson also testified that she made no observations of Oliver's ankle and that she did not make any further observations of Oliver during the remainder of her working shift, which ended at 6:00 a.m. Doc. 41 at ¶¶ 112–13; Doc. 48 at 9; Doc. 68 at 2. Stenson did not return to work during the time Oliver was at the WCJ on September 8 or 9, 2012. Doc. 42-7 at 6; Doc. 60 at ¶ 66; Doc. 63.

Once sober and after posting bond, Oliver was released from the WCJ at 9:15 a.m. on Sunday, September 9, 2012. Doc. 41 at ¶¶ 120, 126–27; Doc. 48 at 10–11; Doc. 68 at 2. Kathy Mach ("Mach"), the correctional officer who released Oliver, testified that she and other WCJ staff assisted Oliver out of the jail in the wheeled chair and helped him get into a vehicle. Doc. 42-8 at 1, 5. Oliver's friend, Ronald Bruns, drove Oliver to the emergency room in Gregory,

---

[4]Neither of the officers testified whether Deputy Drey and Stenson had a conversation in the WCJ booking area. See Doc. 39-3; Doc. 42-6.

South Dakota, where he was examined by Physicians Assistant Katie Urban ("PA Urban") at approximately 9:55 a.m. Doc. 42-5 at 1, 4; Doc. 42-10 at 2.

PA Urban testified that Oliver's ankle was swollen and that Oliver reported experiencing "pretty significant" pain. Doc. 42-5 at 4, 7. Oliver was given hydrocodone, a pain medication, and shortly thereafter Oliver reported his pain level had decreased. Doc. 42-5 at 4. X-rays of Oliver's ankle were taken, and upon review of those x-rays, PA Urban discovered a fracture.[5] Doc. 42-5 at 2. PA Urban testified that "a fractured bone is a very obvious source of pretty intense pain and most patients need something stronger than over-the-counter pain medicine." Doc. 42-5 at 6. A fractured ankle will cause swelling, no matter what precautions are taken, but swelling is reduced with ice application and elevation. Doc. 42-5 at 6. PA Urban also testified that had another person diagnosed Oliver's ankle as sprained that the diagnosis would be wrong, but not unreasonable. Doc. 42-5 at 7. PA Urban places a posterior lower leg splint on Oliver's right ankle with assistance from Dr. Melissa Bartling. Doc. 42-5 at 1, 3. Oliver was directed not to bear weight on his ankle and to apply ice in twenty minute intervals to reduce swelling. Doc. 42-5 at 3. Because Gregory is a small, rural community, PA Urban had the x-rays sent to CORE Orthopedics Avera Medical Group in Sioux Falls, South Dakota on Monday, September 10, 2012, to be examined by an orthopedic doctor; Oliver was scheduled to see an orthopedic surgeon in Gregory on the following Thursday, September 13, 2012. Doc. 42-5 at 2, 9.

PA Urban also testified about the potential effects of delay in treating an injured ankle. Doc. 42-5 at 3, 7. According to PA Urban, a twenty-four hour delay in treatment of Oliver's ankle could create adverse effects if Oliver walked on his ankle during that time, but that it was also possible that the condition of his ankle would not change. Doc. 42-5 at 3. PA Urban found

---

[5]Orthopedic doctors later confirmed that Oliver suffered from a distal fibula fracture. Doc. 42-5 at 12–13.

it difficult to determine whether adverse effects resulted in Oliver's case without comparing an x-ray taken at the time of the injury with an x-ray taken after a twenty-four hour delay of treatment. Doc. 42-5 at 3. PA Urban testified about her experience, that casting is always delayed because of swelling and that an orthopedic surgeon never puts a permanent cast on immediately, or even within a few days of injury, because swelling can continue to increase and cause an individual's blood circulation to be cut off. Doc. 42-5 at 7. Thus, had Oliver arrived at the emergency room a day earlier, PA Urban testified that Oliver still would have received the same treatment—a temporary splint rather than a cast. Doc. 42-5 at 3, 7.

One of Oliver's expert witnesses, Dr. Christopher Fromm, an emergency room physician for the Spearfish Regional Hospital, opined that Oliver suffered unnecessarily during his incarceration on September 8 and 9, 2012. Doc. 78 at 1. In Dr. Fromm's expert opinion, Oliver "could have received an ice pack and been instructed to keep his right ankle elevated." Doc. 78 at 1. Additionally, the WCJ staff could have provided Oliver with over-the-counter pain medication to reduce his pain while in their custody. Doc. 58-12 at 6–7. Dr. Fromm testified that anti-inflammatories such as Tylenol and Motrin can be given to someone with a blood alcohol content level of .026, which was Oliver's blood alcohol level at 1:00 p.m. on September 8, 2012. Doc. 58-12 at 6–7. Obtaining immediate medical attention is important, in Dr. Fromm's expert opinion, because it would "prevent complications, further injury, and unnecessary pain and suffering." Doc. 78 at 1. Finally, Dr. Fromm testified that he was not aware of any adverse medical effect on Oliver or his ankle because he was taken to the hospital on September 9, rather than September 8. Doc. 39-5 at 4; 58-12 at 8.

10

Oliver testified in January of 2015 that his ankle "appears to be okay" now. Doc. 39-1 at 8. When asked whether he has any limitations because of his broken ankle Oliver replied, "It just hurts, like I guess it hurts when the weather changes." Doc. 39-1 at 8.

Oliver's second expert witness, Scott Schuft ("Schuft"), evaluated the WCJ's policies and procedures.[6] Docs. 42-9, 58-10, 79. After reviewing depositions, discovery, and the WCJ's policies and procedures, Schuft opined that the WCJ staff, administration, Deputy Drey, and Officer Claussen[7] failed to comply with the WCJ's own policies and procedures when dealing with Oliver and that the WCJ staff, Deputy Drey, and Officer Claussen failed to provide Oliver adequate medical care. Doc. 79 at 2. Schuft outlined that "Winner policy F (regulations) 10 (healthcare) (WO167) ["(Winner Policy F.10")"] clearly states that prior to admission of an inmate the correctional officer shall conduct a preliminary health evaluation" and that the evaluation should include "any notations of body deformities, trauma markings, bruises, lesions, ease of movement and jaundice." Doc. 79 at 2. Schuft also noted that Winner Policy F.10 allows for a "total rejection of an inmate due to serious illness or injury," and "also states that in case of an injury or illness the staff is to consult the Winner hospital or [emergency room] for instructions." Doc. 79 at 2. Schuft reasoned that Oliver was not provided adequate medical care and that policies and procedures of the WCJ were not followed because the WCJ staff "accepted the word and assessment of Deputy Drey," did not conduct its own independent examination of Oliver, did not complete a preliminary health evaluation of Oliver at the time of his admission, and did not contact the Winner emergency room during Oliver's stay for instruction. Doc. 79 at 2.

---

[6]The Winner Defendants object to Schuft's testimony claiming that he "is not qualified to give this type of expert opinion." Doc. 68 at 3. Schuft has worked for several years at the Pennington County Jail, a jail located in Rapid City that is substantially larger than the WCJ. Doc. 79 at 1.
[7]Neither Deputy Drey nor Officer Claussen, however, are WCJ employees.

11

Schuft also reported that in his expert opinion, the administration of the WCJ failed to adequately train, supervise, or control WCJ jail staff, which resulted in a violation of Oliver's rights as an inmate. Doc. 79 at 3. According to Schuft, the WCJ staff who had contact with Oliver "did not understand their professional responsibilities and duties as provided by the [WCJ's] own policies and procedures as would be expected by national standards for correctional facilities." Doc. 79 at 3. Schuft further noted that there is no annual training provided to WCJ staff on WCJ policies and procedures; one of the WCJ correctional officers, Mach, testified that over her five and one-half year employment she cannot remember the last time she was required to read the policy manual. Doc. 42-8 at 1, 5; 79 at 3. In Schuft's expert opinion, those parties who were deposed regarding Oliver's incarceration on September 8 and 9, 2012, including staff and administrators,[8] failed to recognize their own violations of policies; that failure, Schuft concluded, "give[s] rise to the inference that a pattern exists" that inmates are being denied the right to medical care while at the WCJ and that the failures in Oliver's case "were so systemic" that they cannot be viewed as a mere oversight. Doc. 79 at 3. Schuft also testified that, in his opinion, the policies and procedures adopted by the WCJ are not satisfactory. Doc. 42-9 at 2. According to Schuft, the WCJ policies and procedures should include more specifics in the provisions addressing training, information in activity logs, what inmates are provided, and medical care, such as detoxification. Doc. 42-9 at 2. Schuft reached this opinion

---

[8]Jail staff and administrators not previously identified in this opinion and listed in Schuft's expert report include the following: Lori Kalenda, jail administrator, Doc. 54 at 1; Paul Schueth, Chief of Police for the City of Winner, which owns and operates the WCJ, Doc. 56 at 1; Justin Peterson, jail staff, Doc. 58-8 at 3; Doug Gossard, jail staff, Doc. 58-7 at 3–4; and three individuals whose specific positions are not clear in the record—Chris Davidson, Trent Sinclair, and Damon Wolf. Doc. 79 at 1.

by comparing the WCJ's policies and procedures to the American Correctional Association Core Jail Standards ("ACA Core Jail Standards").[9] Doc. 42-9 at 2.

## IV. DISCUSSION

### A. Constitutional Standard

Oliver asserts that his Fifth, Eighth, and Fourteenth Amendment rights were violated after his arrest and while detained at the WCJ. "Although 'the Eighth Amendment has no application' until there has been a 'formal adjudication of guilt,' the Fourteenth Amendment gives state pretrial detainees—just as the Fifth Amendment gives federal pretrial detainees—rights which are '*at least as great* as the Eighth Amendment protections available to a convicted prisoner.'" Walton v. Dawson, 752 F.3d 1109, 1117 (8th Cir. 2014) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)); see also Christian v. Wagner, 623 F.3d 608, 613 (8th Cir. 2010) (noting that the Eighth Amendment does not apply to pretrial detainees but that "the Due Process Clause of the Fourteenth Amendment imposes analogous duties on jailers to care for detainees"); Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007) (noting change of analysis, however, "makes little difference as a practical matter"). When the alleged deprivation occurred, Oliver had not been arraigned or convicted, thus the Due Process Clause required that he "not be punished."[10] Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979).

---

[9]The Winner Defendants object to Schuft's use of the ACA Core Jail Standards because "there is no evidence the City of Winner is required to have formal policies. The ACA [Core Jail Standards] is irrelevant, since the City of Winner is not ACA certified, and has never so requested." Doc. 68 at 2.

[10]Only cases decided before Oliver's detention in September 2012 are pertinent to a qualified immunity analysis. However, case law since 2012 has reaffirmed and clarified that pretrial detainees such as Oliver are not subject to being punished. See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475 (2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically." (quotation omitted)); Walton, 752 F.3d at 1117 ("The Constitution shield[s] [pretrial detainees] not only from 'cruel and unusual punishment,' but from *any* punishment whatsoever." (internal quotation omitted)).

## B. Individual Capacity Liability

Under the Due Process Clause, a governmental entity detaining someone like Oliver must provide pretrial detainees with appropriate medical care. City of Revere, 463 U.S. at 244. In order to show that Deputy Drey, Officer Claussen, and Stenson individually failed to provide Oliver adequate medical treatment, Oliver must prove "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011); see also Letterman v. Does, 789 F.3d 856, 861–62 (8th Cir. 2015) (noting the first element is objective and the second is subjective); Hall v. Ramsey Cty., 801 F.3d 912, 920 (8th Cir. 2015).[11]

### 1. Objectively Serious Medical Need

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). Here, Oliver was not diagnosed by a physician until after he posted bond and was released. Therefore, Oliver's condition while in custody must have been so obvious that a layperson would easily recognize the need for treatment.

---

[11] In Kingsley v. Hendrickson, the Supreme Court of the United States held that a pretrial detainee need only show that the defendant-official's use of force was objectively unreasonable in a § 1983 case alleging excessive force. 135 S. Ct. at 2470. That holding, however, was limited to excessive force cases under the Fourteenth Amendment. Id. at 2476. Thus, the Eighth Circuit still utilizes the subjective measure of deliberate indifference as set forth in Farmer v. Brennan, 511 U.S. 825 (1994), for pretrial detainees in Fourteenth Amendment cases involving an allegation of deprivation of medical care. See Hall, 801 F.3d at 917 n.3, 920 (noting Kingsley's holding in discussion of pretrial detainee's excessive force claim and then applying subjective prong of deliberate indifference to same pretrial detainee's deprivation of medical care claim).

14

The determination whether a medical need is sufficiently obvious requires an analysis of the defendants' background knowledge. Jones, 512 F.3d at 482. The Eighth Circuit has found a serious medical need that was obvious to a layperson where an inmate: complained of pain and complications eating food due to a broken jaw that appeared to jailers as deformed and "far out of place," see Wise v. Lappin, 674 F.3d 939, 940–41 (8th Cir. 2012) (per curiam); was pregnant, bleeding, and passing blood clots, see Pool v. Sebastian Cty., Ark., 418 F.3d 934, 945 (8th Cir. 2005); had swollen and bleeding gums and complained of extreme tooth pain, see Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004); experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to known diabetes, see Roberson v. Bradshaw, 198 F.3d 645, 647–48 (8th Cir. 1999); or exhibited signs of early labor and the inmate's medical records clearly documented a history of rapid labor and delivery, see Coleman, 114 F.3d at 785. Conversely, the Eighth Circuit has found a serious medical need is not obvious to a layperson where: an overweight inmate was unable to stand or walk, was unresponsive and "google-eyed," was rolling on the ground and groaning, and was breathing rapidly, but did not request medical attention, see Jones, 512 F.3d at 482–83; and a pretrial detainee, who was found soaking wet in a creek, was combative, gave nonsense answers to questions, began screaming in holding cell, and officers were aware detainee was under the influence of methamphetamine, see Grayson v Ross, 454 F.3d 802, 809–10 (8th Cir. 2006).

The Gregory Defendants and the Winner Defendants argue that Oliver did not suffer from an objectively serious medical need and base those arguments on the testimony of Deputy Drey, Officer Claussen, and Stenson. Doc. 37 at 6; Doc. 59 at 15. The Gregory Defendants contend that neither officer subjectively believed medical attention to be required because Oliver walked to the patrol vehicle while putting weight on both legs. Doc. 37 at 7. However, Oliver

15

testified to the contrary that he could not put weight on his ankle and that the officers had to help him to the vehicle. Doc. 42-3 at 3. The Winner Defendants argue that Oliver did not suffer from an objectively serious medical need because Stenson was unaware of any serious medical condition Oliver might have suffered from, made no observations of Oliver's ankle, and never was told that Oliver's ankle hurt. Doc. 59 at 15–16. However, Oliver testified that he was wheeled in to the WCJ because he could not walk and that while Stenson was booking him he said that his ankle hurt and he needed a doctor. Doc. 58-11 at 13.

In order to find as a matter of law that Oliver did not suffer from an objectively serious medical need as the Gregory Defendants and the Winner Defendants contend, this Court must be convinced that no reasonable jury would find that Oliver's condition was so obvious that a layperson would easily recognize the need for medical treatment. This is a close question, in that Oliver's ankle was not bleeding, no bones were protruding, the ankle was not in an unnatural position, and a lay person rationally could have wrongly thought the ankle to be sprained. But when viewing the facts in a light most favorable to Oliver, and not merely crediting the individual accounts of Deputy Drey, Officer Claussen, or Stenson, a reasonable jury could find that Oliver suffered from an objectively serious medical need. Oliver testified that he told the officers he thought his ankle was broken, that the officers lifted him off the ground and carried him—their arms under his shoulders—to the patrol vehicle, and that he did not put any weight on his right leg other than his touching his toe to the ground to maintain balance. After both officers observed Oliver's swollen ankle and stated that they believed Oliver's ankle was sprained, the officers transported Oliver to the WCJ. At the jail, Oliver did not put any weight on his right leg and had to be wheeled into the booking area in a wheeled chair. Stenson was present at the WCJ when Oliver was wheeled into the booking area. Oliver then testified he told Stenson that his

ankle hurt and he needed to see a doctor. Taking the facts in the light most favorable to Oliver, Oliver's complaints of pain, requests for medical attention, refusal or reluctance to bear weight on his right leg and ankle, and presence of swelling observable at the scene and in the booking area, could cause a reasonable jury to find that Oliver's ankle condition was sufficiently obvious that a layperson would easily recognize the need for medical treatment. See Johnson v. Hamilton, 452 F.3d 967, 971–73 (8th Cir. 2006) (finding fractured finger was an objectively serious medical need where nurse told prisoner that because his finger was swollen he had probably sustained fracture); Plemmons v. Roberts, 439 F.3d 818, 823–24 (8th Cir. 2006) (finding objectively serious medical need where pretrial detainee told the booking officer he was a heart patient and shortly thereafter began experiencing common heart attack symptoms).

## 2. Deliberate Indifference

Even though a reasonable jury could find that Oliver suffered from an objectively serious medical condition, Oliver must then establish deliberate indifference, which requires Oliver demonstrate that the defendants knew of and disregarded an excessive risk to his health or safety. Letterman, 789 F.3d at 862; see also Farmer, 511 U.S. at 837 (holding "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). "[A]ctual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious." Jones, 512 F.3d at 481–82 (citing Farmer, 511 U.S. at 842). "It is sufficient to show that 'the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it.'" Letterman, 789 F.3d at 862 (quoting Farmer, 511 U.S. at 842). If knowledge is shown, the plaintiff must then show the defendants "'knew that their conduct was

17

inappropriate in light of the risk to the prisoner." Letterman, 789 F.3d at 862 (quoting Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)); see also Hall, 801 F.3d at 920.

"Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cnty., S.D., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). However, deliberate indifference is "greater than gross negligence and requires more than mere disagreement with treatment decisions." Id. (quoting Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006)); see also Ruark v. Drury, 21 F.3d 213, 216 (8th Cir. 1994) (stating the delay "must also be prompted by 'obduracy and wantonness, not inadvertence or error in good faith'" (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986))). When evaluating whether a defendant deliberately disregarded a risk, the court considers the "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)).

There is considerable disparity in the testimony and evidence from Oliver, Deputy Drey, and Officer Claussen. Certainly if the testimony of Deputy Drey and Officer Claussen is believed, then they were not deliberately indifferent and indeed lacked knowledge of a serious medical need. However, this Court does not resolve whom to believe when ruling on a summary judgment motion and instead must view the facts in the light most favorable to Oliver even though doing so requires the difficult step of crediting the testimony of an intoxicated arrestee over the testimony of sober public officials. If Oliver is believed, a reasonable jury could find that both Deputy Drey and Officer Claussen were deliberately indifferent to Oliver's medical

18

needs and could infer actual knowledge of a serious medical need because Oliver's medical condition was sufficiently obvious to warrant medical treatment, Jones, 512 F.3d at 481–82 (inferring actual knowledge from fact that serious medical need was obvious), and both officers were exposed to information concerning Oliver's ankle—Oliver's statement that he thought his ankle was broken, his inability to bear weight, and visible swelling—sufficient to show that they "'must have known'" about Oliver's medical need, Letterman, 789 F.3d at 862 (quoting Farmer, 511 U.S. at 842). Continuing to view the evidence and all reasonable inferences in Oliver's favor, a reasonable jury could find that Deputy Drey and Officer Claussen then disregarded an excessive risk to Oliver's health because each chose not to obtain medical treatment for Oliver. Oliver testified that while in the WCJ booking area he said, in the presence of Deputy Drey, Officer Claussen, and Stenson, that his ankle hurt and that he needed to see a doctor. Oliver testified that Stenson then asked Deputy Drey if Oliver was really hurt, to which Deputy Drey shook his head and replied, "[N]o, he is not hurt, put him in the jail cell." Officer Claussen was standing next to Deputy Drey during this exchange and did not correct or object to Deputy Drey's statement. See Letterman, 789 F.3d at 863 (finding reasonable jury could infer deliberate indifference where defendant-official knew of the risk to prisoner and did nothing in response).

The Gregory Defendants argue that the officers did not deny any and all medical care to Oliver; rather, they "simply made a determination that he did not need emergency care prior to being transported to the [WCJ]" and that the WCJ had a policy in place which allowed pretrial detainees to receive medical treatment. Doc. 37 at 9. But a reasonable jury could find that when Deputy Drey told Stenson that Oliver was not really hurt, and with a silent Officer Claussen nearby, that both officers knew that their conduct was inappropriate in light of the risk to Oliver. The Gregory Defendants also argue that any alleged failure of the officers to draw the inference

19

that a substantial risk of serious harm exists would, at the very worst, have even been negligent because PA Urban testified that had another person diagnosed Oliver's ankle as sprained that the diagnosis would be wrong, but not unreasonable. Doc. 37 at 10–11. However, neither of the officers ever told the WCJ staff that Oliver's ankle was sprained; instead, according to Oliver, Stenson was told by Deputy Drey, without correction or qualification from Officer Claussen, that Oliver was not hurt.

Stenson and Oliver's recollection of events also differ, but when viewing the facts in the light most favorable to Oliver, a reasonable jury could find that Stenson was deliberately indifferent to Oliver's medical needs. Actual knowledge could be found by inference, Jones, 512 F.3d at 481–82, and because Stenson also "'must have known'" about Oliver's medical needs because she knew Oliver had to be wheeled into the WCJ with a wheeled chair, and, according to Oliver, while in the booking area and in Stenson's presence he complained of ankle pain and requested to see a doctor, Letterman, 789 F.3d at 862. Stenson was familiar with Oliver from a previous period of incarceration, Doc. 42-7 at 1, and would know that he typically could ambulate. A reasonable jury could then find that Stenson disregarded an excessive risk to Oliver's health because rather than independently assessing Oliver's condition, she purportedly accepted Deputy Drey's statement: "[N]o, [Oliver] is not hurt, put him in the jail cell." Moreover, knowing that Oliver had to be wheeled into the booking area because he would not walk on his leg and after hearing Oliver's complaints of ankle pain and requests for medical attention, Stenson did not complete a medical questionnaire for Oliver. Stenson was with Oliver for sufficient time for her to have completed the medical questionnaire and to have independently observed Oliver's ankle which, according to Oliver, was visibly swollen. Instead,

20

Stenson completed a brief intake, assigned Oliver a holding cell, and made no further contact with Oliver over the next one-and-one-half hours until her shift ended.

The Winner Defendants argue that even if Stenson was negligent, such conduct does not amount to deliberate indifference and cite to three cases for that proposition, Scott v. Coleman, 439 F. App'x 783 (11th Cir. 2011) (per curiam), Raheem v. Stout, 101 F. App'x 603 (6th Cir. 2007), and Loukas v. Gundy, 70 F. App'x 245 (6th Cir. 2003). Doc. 59 at 17–18. Even though each of those cases involves an ankle injury of some degree, all are distinguishable from Oliver's case for two reasons. First, all of the petitioners in those cases were convicted prisoners, not pretrial detainees. Second, each prisoner was eventually provided some form of medical treatment, ranging from medical examinations, x-rays, and castings, to accesses to pain medications, crutches, and bandage wraps for swelling. See Scott, 439 F. App'x at 784, Raheem, 101 F. App'x at 604; Loukas, 70 F. App'x at 246. In this case, Oliver was not provided any medical treatment at the WCJ. A reasonable jury could find that Stenson's inactions were more than merely negligent, but amounted to deliberate indifference of Oliver's medical needs. See Plemmons, 439 F.3d at 824–25 (affirming denial of summary judgment where pretrial detainee alleged prison officials delayed medical treatment of objectively serious medical need after pretrial detainee told prison officials about past medical problems and requests for medical assistance and symptoms were ignored).

### 3. Effect of Delay in Treatment

Both the Gregory Defendants and the Winner Defendants assert that Oliver's § 1983 claim should be precluded because Oliver has failed to offer evidence that a delay in treatment had a detrimental effect on his condition. Doc. 37 at 11–14; Doc. 59 at 18–23. The Winner Defendants further argue that Oliver may only present evidence to prove a detrimental effect

21

from an expert—that is, only evidence from PA Urban and not evidence from Oliver himself—because Oliver suffered from a "'sophisticated medical condition.'" Doc. 59 at 20 (quoting Alberson v. Norris, 458 F.3d 762, 765–66 (8th Cir. 2006)). Oliver counters that, although his ankle condition is a sufficiently serious injury, it is not a sophisticated condition. Doc. 44 at 9.

"When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" Coleman, 114 F.3d at 784 (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)). "An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." Id. Verifying medical evidence is required even if a plaintiff alleges a need that is so obvious that even a layperson would easily recognize the necessity for medical attention.[12] Jackson v. Riebold, No. 14-2775, 2016 WL 722947, *5 (8th Cir. Feb. 24, 2016). When applying this standard, the Eighth Circuit has "previously held that where an inmate 'submitted evidence documenting his diagnosis and treatment, [but] he offered no evidence establishing that any delay in treatment had a detrimental effect,' the inmate 'failed

---

[12]The Eighth Circuit has previously stated that if "[a] medical need . . . would be obvious to a layperson . . . verifying medical evidence [is] unnecessary." Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011) (citing Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004)); see also Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999) ("In determining whether the inmate has an objectively serious medical need, 'we have repeatedly emphasized that the need or the deprivation alleged must be *either obvious to the layperson* or supported by medical evidence, like a physician's diagnosis.'" (quoting Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995))). But in Jackson, No. 14-2775, 2016 WL 722947, *5 (8th Cir. Feb. 24, 2016), the Eighth Court rejected the plaintiff's argument that verifying medical evidence is unnecessary to prove a deliberate indifference claim based on a delay in medical treatment for an inmate who alleges that the need for medical attention was obvious to a lay person. The Eighth Circuit reasoned that the analysis does not end if an objectively serious medical need is found under the layperson standard, but rather continues on to determine whether the plaintiff has presented sufficient verifying medial evidence in the record to prove that the defendant "'ignored a critical or escalating situation or that the delay posed a substantial risk of serious harm' for [his or] her claim to succeed." Id. at 9 (quoting Coleman, 114 F.3d at 785).

22

to raise a genuine issue of fact on an essential element of his claim.'" Id. at *4 (alteration in original) (quoting Laughlin v. Schriro, 430 F.3d 927, 928 (8th Cir. 2005)); see also Senty-Haugen v. Goodno, 462 F.3d 876, 890 (8th Cir. 2006) (stating that plaintiff who alleged delays in medical treatment "failed to present any evidence that the alleged delays in treatment worsened his conditions . . . and he has not provided any expert evidence that the treatment he received was inadequate."); Moots v. Lombardi, 453 F.3d 1020, 1023 (8th Cir. 2006) (noting that inmate's complains of delay in medical treatment must include verifying medical evidence that delay caused detrimental effect); Dulany v. Carnahan, 132 F.3d 1234, 1243 (8th Cir. 1997) (holding summary judgment for defendants was proper where plaintiff never submitted verifying medical evidence showing that a delay in medical treatment resulted in an adverse effect).

In the previous Opinion and Order Granting in Part and Denying in Part Defendant's Motions for Summary Judgment, Doc. 80, this Court considered Oliver's case to be a *denial* of medical treatment by the Defendants, different from a mere *delay* in the Defendants providing treatment, Doc. 80 at 20–21. This Court reasoned that Oliver's case was a denial of medical treatment because Defendants admittedly provided no medical treatment to Oliver on September 8 or 9, 2012, and Oliver's complaint alleges a refusal of medical treatment. Doc. 80 at 21. Concluding that a reasonable jury could find that both the Gregory Defendants and the Winner Defendants were deliberately indifferent in denying care to pretrial detainee Oliver's medical needs regardless of proof of a deleterious effect of delayed treatment, this Court denied summary judgment for Deputy Drey, Officer Clausen, and Stenson in their individual capacities. Doc. 80 at 21.

Nine days after this Court entered its Opinion and Order, Doc. 80, the United States Court of Appeals for the Eighth Circuit issued an opinion in Bailey v. Feltmann, 810 F.3d 589

(8th Cir. 2016). This Court sent counsel copies of the Bailey decision, held a hearing with counsel on January 20, 2016, Doc. 84 at 1–3, and set a briefing schedule on the impact of Bailey on this case, Doc. 81. This Court made clear its concern with the effect Bailey had on this Court's distinction between a denial-of-treatment and a delay-of-treatment case for purposes of evaluating a § 1983 claim for deliberate indifference to a serious medical need. Doc. 81. Thereafter, Oliver submitted a supplemental brief, Doc. 85, the Gregory Defendants and Winner Defendants submitted separate supplemental response briefs, Docs. 88, 90, and Oliver submitted a reply supplemental brief, Doc. 91.

In Bailey, the Eighth Circuit held that Shane Bailey, a pretrial detainee, had not presented medical evidence that he experienced a serious medical need for immediate care at the time of his arrest, nor did he present evidence of a delay in treatment that caused detrimental effects, and that Bailey's injury was not so dramatic that a layperson would have easily recognized the need for medical treatment. 810 F.3d at 594. Bailey, an eighteen year old who had been drinking alcohol, became upset, punched the side mirror of his truck at a friend's home, and badly cut his right hand as a result. Id. at 591. Bailey drove off in his truck until he ran out of gas and then called for emergency help. Id. Paramedics responded and treated Bailey's right hand; the paramedics controlled the bleeding by dressing the wound and noted that the area around the cuts was bruised and swollen. Id. The Defendant, Deputy Feltmann, also responded to Bailey's call, saw the damage to Bailey's truck including blood on the truck's rear window, and observed bandages on Bailey's hand. Id. Because Deputy Feltmann could not determine the full extent of Bailey's injuries by looking at the bandages, Deputy Feltmann asked Bailey how he sustained the hand injury. Id. at 591–92. While Bailey explained that he had punched his truck, Deputy

24

Feltmann detected signs of intoxication so Bailey was placed under arrest for drunk driving. Id. at 592.

One of the two paramedics who treated Bailey testified that "the paramedics advised the deputy at the scene that Bailey's right hand needed sutures and that Bailey needed to be taken to an emergency room for evaluation." Id. A report from the paramedics noted that the deputy had agreed to transport Bailey to a hospital before transporting him to jail. Id. While Bailey was in Deputy Feltmann's custody, Bailey was bleeding through the bandages on his right hand. Id. Bailey, however, did not complain or request additional medical treatment. Id. Deputy Feltmann drove Bailey directly to the jail and relinquished custody of Bailey to jail staff, having no further contact with Bailey thereafter. Id.

Bailey's family picked Bailey up from jail early the next morning and took him to the emergency room for treatment. Id. The examining physician "noted that Bailey's pain was mild, determined that his hand was not tingling or numb, and found that he had no loss of sensation in his hand." Id. After an x-ray showed no fractures, glass was removed from Bailey's hand and his cuts were cleaned.[13] Id. The physician gave Bailey ibuprofen but "chose not to suture any of the cuts, because the injuries had occurred nearly twenty-four hours earlier, and the skin was 'too rotted' to stitch." Id. Bailey did not have his hand examined or seek additional treatment after March 14, 2012. Id. Bailey testified that he has several scars on his hands from the cuts and that he experiences pain on rare occasion between two fingers on his right hand. Id. Bailey did not miss time from work and could not recall costs incurred for medical treatment of his hand. Id.

---

[13]The physician also treated a cut that Bailey had sustained on his forehead while at the jail. Bailey, 810 F.3d at 592. Bailey sought follow-up treatment for his forehead, but not his hand. Id.

25

Bailey argued on appeal that Deputy "Feltmann's decision to proceed to the jail rather than to a hospital exhibited deliberate indifference to his need for medical attention in violation of his clearly established constitutional rights under the Due Process Clause."[14] Id. at 593. The Eighth Circuit, however, found that Bailey had "not presented medical evidence that he experienced a serious medical need for urgent care at the time of his arrest, and there [was] no evidence that a delay in treatment caused detrimental effects." Id. at 594. Next, the Eighth Circuit found that "[t]he circumstances apparent to [Deputy] Feltmann at the time of arrest were not so dramatic that a layperson easily would have recognized an obvious need for immediate care by a physician." Id. The Eighth Circuit concluded that the paramedic's statement to Deputy Feltmann that Bailey needed to go to the emergency room for sutures "[did] not necessarily establish an objectively serious medical need for immediate treatment that would be obvious to a layperson." Id. Because Bailey had been treated and the bleeding was controlled, Deputy Feltmann did not observe excessive bleeding; and because Bailey never complained or requested medical treatment, the Eighth Circuit was not convinced that a layperson would have found a need for prompt medical treatment. Id.

The Eighth Circuit characterized Bailey's case as a delay-in-treatment case, rather than a denial-of-treatment case. Id. This characterization was made despite briefing to the Eighth Circuit that Bailey's case should be classified as a denial-of-medical-treatment case because Bailey sliced his hand, the wound continued seeping blood, and he received no treatment whatsoever after being taken into custody until he was released from pretrial detention. Brief of Appellant Shane Bailey, Bailey v. Feltmann, 810 F.3d 589 (8th Cir. 2016) (No. 14-3859), 2015 WL 741024, at *23–24. Because Bailey had not produced sufficient evidence to support a

---

[14]Bailey also presented a Fourth Amendment claim, Bailey, 810 F.3d at 593, but that portion of the opinion is not relevant here because Oliver makes no such claim, Doc. 85 at 6; Doc. 1.

26

finding that Deputy Feltmann violated a constitutional right, the Eighth Circuit ultimately affirmed the district court's grant of summary judgment for Deputy Feltmann on qualified immunity grounds. Bailey, 810 F.3d at 594.

Oliver asserts that "Bailey is thoroughly supportive of his position against Defendants' summary judgment motion[s]." Doc. 85 at 1; Doc. 91 at 1. Yet, Oliver contends that Bailey is factually distinguishable from Oliver's case on twelve grounds, Doc. 85 at 4–5, and that unlike Bailey, circumstances in Oliver's case were so dramatic that a layperson would easily recognize an obvious need for immediate care by a physician, Doc. 85 at 6–7. Meanwhile, the Gregory Defendants and Winner Defendants assert that Bailey's facts are "remarkably similar to the present action" or are "virtually identical." Doc. 88 at 1; Doc. 90 at 4.

The recent Bailey decision makes clear that, under Eighth Circuit precedent, no difference exists in analyzing a delay versus a denial-of-treatment case. The Eighth Circuit treated Bailey's claim as a delay-in-treatment case notwithstanding the fact that Bailey received no treatment whatsoever while in custody and notwithstanding the fact that it was argued as a denial-of-treatment case. Here, Oliver similarly did not receive any medical treatment while in custody of Deputy Drey, Officer Claussen, or Stenson. Oliver, like Bailey, had to wait until being released from pretrial detention to obtain medical care on his own. Oliver argues that Bailey is distinguishable because Bailey received paramedic treatment before he was taken into Deputy Feltmann's custody, whereas Oliver did not. Doc 91 at 3. But that is a distinction without a difference, particularly when considering that the paramedics told Deputy Feltmann to take Bailey to the hospital first before jail, which Deputy Feltmann chose not to do. Bailey, like Oliver, was denied medical treatment altogether after being taken into custody and the officer in Bailey disregarded a paramedic's request to get Bailey further care. In light of the Bailey

27

decision, Oliver's case must be analyzed just like a delay-in-treatment case; Bailey draws no distinction between delay-in-treatment and denial-of-treatment cases.

Even if a plaintiff alleges a need that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention, as found by this Court in section IV.B.1. above, verifying medical evidence is still required to establish a detrimental effect of delay in medical treatment for a claim of deliberate indifference to proceed. Jackson, 2016 WL 722947, *5; Coleman, 114 F.3d at 784; see Bailey, 810 F.3d at 594. While Oliver submitted evidence of the treatment he received on September 9, 2012, and testimony from his own medical expert that Oliver went without pain medication, an ice pack, and proper elevation, he offered no evidence establishing that the delay in medical treatment had a detrimental effect on his condition. PA Urban testified that a twenty-four hour delay in treatment of Oliver's ankle might or might not cause adverse effects. PA Urban also testified that had Oliver visited the emergency room a day earlier, Oliver still would have received a temporary splint rather than a cast because casting of a broken ankle is almost always delayed due to swelling. Moreover, due to the City of Gregory's size and rural location, Oliver would have had to wait to see an orthopedic doctor until the next scheduled time—the following Thursday, September 13, 2012—regardless of whether he received treatment on September 8 or 9, 2012. Dr. Fromm testified that he was not aware of any adverse medical effect on Oliver or his ankle because of an approximate one-day delay in medical treatment. Finally, Oliver himself testified that his ankle "appears to be okay" and only "hurts when the weather changes." Doc. 39-1 at 8. In light of the Bailey decision, Oliver has failed to raise a genuine issue of fact on an essential element of his claims against Deputy Drey, Officer Claussen, and Stenson in their individual capacities. See Laughlin, 430 F.3d at 929; see also Senty-Haugen, 462 F.3d at 890; Moots, 453 F.3d at 1023; Dulany, 132 F.3d at 1243.

Therefore, Deputy Drey, Officer Claussen, and Stenson are entitled to qualified immunity. See Walton, 752 F.3d at 1116 ("On summary judgment, a defendant official is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" (quoting Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009))); Pearson v. Callahan, 555 U.S. 223, 236 (2009) (stating that if a § 1983 plaintiff fails to establish either prong qualified immunity shields the officials from suit); see also Bailey, 810 F.3d at 594 (finding that defendant was entitled to qualified immunity because plaintiff could not demonstrate that he was deprived of a constitutional right).

## D. Official Capacity, County, and City Liability

Oliver asserts that the County of Gregory, the City of Gregory, and the City of Winner "failed to train and supervise deputies, police officers, and jailers in the proper handling of detainees who require medical care or assistance." Doc. 1 at 3. Oliver also has sued Deputy Drey, Officer Claussen, and Stenson in their official capacities. Doc. 1. The Eighth Circuit has noted that "[a] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)). Thus, for liability to attach to the municipalities and to officials in their professional capacity, Oliver must prove that each "municipality *itself* caused the constitutional violation at issue." Id. (quotation omitted).

"In general, 'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents' on a respondeat superior theory of liability." Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quoting Monnell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)); see also Bd. of Cty. Comm'rs of Bryan Cty., Okla., v. Brown, 520 U.S. 397, 405

(1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). A local government may be liable in limited circumstances such as inadequate employee training, but liability will attach "only where the failure to train amounts to deliberate indifference." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). The Eighth Circuit has stated that a municipality may be liable for failure to train under a three-part showing where "(1) the municipality's training practices were inadequate; (2) the municipality was deliberately indifferent to the constitutional rights of others, such that the 'failure to train reflects a deliberate or conscious choice' by the municipality; and (3) an alleged deficiency in the training procedures actually caused the plaintiff's constitutional injury." Rodgers v. Knight, 781 F.3d 932, 942 (8th Cir. 2015) (internal quotation marks omitted) (quoting Harris, 489 U.S. at 388–91), cert. denied, 2015 WL 4515449. Deliberate indifference "as applied to a municipality in the Fourteenth Amendment context" differs from the subjective inquiry of individual officials; here, the analysis is "purely objective: 'liability [may] be premised on obviousness or constructive notice.'" Walton, 752 F.3d at 1117 (emphasis omitted) (quoting Farmer, 8511 U.S. at 841); see also Harris, 489 U.S. at 390; Connick v. Thompson, 563 U.S. 51, 61–62 (2011) (providing that a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.' (quoting Harris, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part))).

Oliver's official capacity and municipality claims against the Gregory Defendants and the Winner Defendants fail because, under Harris, a failure to train case must include proof that "an alleged deficiency in the training procedures actually caused the plaintiff's constitutional injury."

30

489 U.S. at 388; see also Rodgers, 781 F.3d at 942. As discussed above, the Bailey decision and Oliver's lack of a showing of a detrimental effect of a delay in treatment dooms Oliver's official capacity and municipality claims and thus summary judgment for all Defendants must enter in light of the Bailey decision. Moreover, Oliver's allegations that the City of Gregory and the County of Gregory have a policy of inadequate training and supervision fail because he has not presented evidence that those local governments' policies were inadequate or that the local governments' failure to train amounts to deliberate indifference.[15] See Mettler, 165 F.3d at 1204 (finding plaintiff presented no policy argument because plaintiff did not identify any official policy that arguably played a role in the alleged constitutional violation).

## E. Additional Motions

Plaintiff has filed two additional motions—Plaintiff's Motion for Order Striking Supplemental Brief [re: Bailey decision] and Allied Documents of Defendants City of Winner and Lakin Stenson, Doc. 92, and Plaintiff's Motion for Order Striking Those Portions of Supplemental Brief [re: Bailey decision] of Defendants County of Gregory, et al., Not Restricted to Bailey, Doc. 94—arguing that the Defendants used supplemental briefing ordered by the Court to re-argue their summary judgment motions and not to focus on Bailey. This Court in this Amended Opinion and Order is not revisiting portions of the decision unaffected by Bailey, but deems striking portions of filed briefs to be improper. This Court's decision to disregard portions of Defendants' briefs renders Oliver's additional motions to be moot.

---

[15]Oliver argues, however, that "'[n]o policy' is a 'policy' in and of itself, as well as a 'custom,'" and posits that the absence thereof may serve as the basis for municipal liability. Doc. 62 at 7–8. But, as stated above, Oliver has not presented any evidence that the City of Gregory or County of Gregory lacked policies. For example, Oliver did not depose local officials about the presence or absence of a policy which would cover how police officers should handle pretrial detainees who require medical care.

31

## V. CONCLUSION

Therefore, it is hereby

ORDERED that Plaintiff's Motions to Strike, Docs. 92 and 94, are denied as moot. It is further

ORDERED that the Gregory Defendants' Motion for Summary Judgment, Doc. 36, is granted.

ORDERED that the Winner Defendants' Motion for Summary Judgment, Doc. 50, is granted. It is further

ORDERED that consistent with the stipulation of the parties, all John and Jane Doe defendants are dismissed.

DATED this 8th day of March, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

32